UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 567 |
| vs. | ) | |
| | ) | Hon. Harry D. Leinenweber |
| | ) | |
| DERREL MCDAVID | ) | |

**DEFENDANT MCDAVID'S RESPONSE REGARDING
<u>MOTION TO SEVER</u>**

COMES NOW the Defendant, DERREL MCDAVID (hereafter "Mr. McDavid"), by and through his attorneys, Beau B. Brindley, Vadim Glozman, and Blair T. Westover, and provides the following response regarding Defendant Kelly's motion to sever.

Mr. McDavid files this response to codefendant Robert Kelly's May 16, 2022 motion to sever, not for the purpose of opposing severance (an issue on which Mr. McDavid takes no position), but for the purpose of correcting abject and unsupported falsehoods, which have been recklessly foisted upon this Court by counsel for Mr. Kelly in an apparent effort to circumvent this Court's denial of her motion to continue. Dkt. 196.

It is one thing to believe you deserve a continuance and disagree with the decision to deny it. That happens to all trial attorneys. It is even understandable for an attorney to be annoyed at the denial of a continuance and those who opposed it. But it is another thing altogether to manufacture the need for severance from a patchwork of bare allegations that recklessly impugn the integrity of respected members of the bar and falsely malign a codefendant while presenting not a shred of actual evidence that supports these sweeping contentions that are made with neither tact nor tether to reality.

Even a superficial examination of the actual evidence in this case makes plain that Mr. Kelly's baseless allegations against Edward Genson (and, by extension, Mr. Glozman) and Mr. McDavid are without merit. Even a cursory understanding of the evidence suggests that anyone making the allegations set forth in the motion to sever is either woefully uninformed or purposely mendacious.

Mr. McDavid emphatically disagrees with the arguments made in paragraphs 18-30 of Mr. Kelly's motion to sever. *See* Dkt. 196, 18-30. In summary, Mr. Kelly alleges that the late Edward Genson engaged in misconduct or perhaps criminal actions while preparing for Mr. Kelly's 2002 trial in Cook County. Further, Mr. Kelly argues that, as a result, Mr. Glozman, who was not hired by Mr. Genson until long after Mr. Kelly's acquittal, is conflicted from representing Mr. McDavid on a case brought a decade thereafter. *See* Dkt. 196, 18-30. The undersigned are concerned that Mr. Kelly's motion could be somehow construed as a basis for disqualifying Mr. Glozman, and thereby depriving Mr. McDavid of his Sixth Amendment right to counsel of choice. Mr. McDavid does not take that matter lightly.

The rules do not permit, and the Sixth Amendment does not allow, any finding of conflict on the part of Mr. Glozman in this instance. Nor will Mr. Glozman's former employment with Mr. Genson affect the instant trial in any respect whatsoever. Mr. Glozman was just entering high school when Mr. Genson was hired by Mr. Kelly (in 2002) and was an undergraduate at the time that Genson's representation ended (in 2008). Mr. Glozman took no part in Mr. Kelly's trial or the preparation thereof. He has absolutely no information, confidential or otherwise, relating to that trial, other than what he has seen in the discovery in the instant case and what is publicly available to anyone with an internet connection and the ability to use Google. It was not until years after Mr. Genson's representation of Mr. Kelly that Mr. Glozman was ever approached

about representing anyone related to this investigation. He was ultimately engaged by only Mr. McDavid.

**ARGUMENT**

A.     TIMELINE AND CHICAGO SUN TIMES INTERVIEW

Mr. Kelly was indicted in state court in 2002. He hired Mr. Genson and his firm to represent him on that matter. The case was tried, and Mr. Kelly was acquitted in 2008. As Mr. Kelly notes in his severance motion:

> "22. According to the government, Individual A – who worked with Kelly's legal team – allegedly agreed to pay money to victims and witnesses and others to ensure that they did not cooperate with law enforcement. Individual A also allegedly arranged for Individual B to be paid hundreds of thousands of dollars for obtaining and returning video tapes that depicted Kelly having sexual contact with a minor.
> 23. According to investigative reports, the conspiracies charged in counts 5 and 6 of the indictment occurred, in part, in the law offices of Ed Genson and that the completed crime of receiving child pornography as alleged in counts 7 and 8 of the indictment took place in Genson's office."

Dkt. 196. Mr. Glozman does not know Individual A. He has never spoken with Individual A. Outside of the discovery in this case, Mr. Glozman has no special knowledge about the relationship between Mr. Genson and Individual A. As the indictment alleges, these acts (which Mr. McDavid will contest robustly at trial) took place between 2001 and 2008. Dkt 1 at 8. The only specific acts charged in Counts 5 and 6 to which Mr. Kelly can possibly be referring took place in 2007 and 2008. *Id*. Count 7 concerns allegations that occurred between 2001 and 2002. Count 8 occurred in 2007. *Id*.

Mr. Glozman was hired as a *law clerk* for another attorney working in Mr. Genson's office in 2012. He started working directly for Mr. Genson in June 2013, again, as a *law clerk*. Mr. Glozman received his law license in May of 2014 and continued working for Mr. Genson as an associate until he closed his office in November of 2017. After Mr. Genson's law office

3

closed, he employed Mr. Glozman periodically for the first half of 2018 to finalize some outstanding matters on behalf of some dozen or so clients. Since then, Mr. Glozman has run his own law practice. Mr. Glozman had nothing to do with any representation of Mr. Kelly at the trial in the underlying state matter, for which he was acquitted well before Mr. Glozman even became a lawyer.

The remainder of Mr. Kelly's claim is a disingenuous attempt to stretch out the length of Mr. Genson's attorney/client relationship with Mr. Kelly. It relies exclusively on an interview that the late Mr. Genson gave to the Chicago Sun times in 2019. https://chicago.suntimes.com/2019/3/7/18392521/r-kelly-was-guilty-as-hell-singer-s-prominent-lawyer-from-first-trial-says. Counsel's reliance on this interview and her attacks on Mr. Genson, are, quite frankly, disingenuous, insulting, and perhaps worse: pointless.

As the Court is aware, and as stated in the interview, Mr. Genson was, at the time, suffering from the latter stages of terminal cancer. What the article omits is that not only was Mr. Genson heavily medicated at the time of the interview, but that he was rushed to the hospital shortly after the interview took place and that the interviewer only entered Mr. Genson's home through false pretenses. In short, relying solely on the manipulative interview of a dying man who was suffering through terminal cancer and the medications that treat it is hardly the portrait of the thoughtful pursuit of truth.

Many aspects of that interview were problematic (to say the least) from an ethics and client confidentiality standpoint.[1] Nonetheless, nothing about these statements, imprudently

---

[1] Mr. Kelly's motion indicates that the ARDC never investigated this incident. That is false. Investigation took place and the decision was made that Mr. Genson's license would be unaffected. If needed, documentation to that affect could be obtained. How counsel for Mr. Kelly could even purport to know whether the ARDC did a confidential inquiry remains a mystery.

4

given by a dying man, limit Mr. Glozman's representation in this case. Mr. Genson did not consult with Mr. Glozman about the interview, nor does Mr. Glozman have any special knowledge as to why Mr. Genson made the statements therein or indeed what those statements mean.

Mr. Kelly suggests that the interview proves that his attorney/client relationship with Mr. Genson continued after his acquittal in state court. Dkt. 196 ("For at least the *next* 10 years (probably much longer), Genson and Kelly maintained an attorney-client relationship.") (emphasis added). The undersigned cannot figure out where Mr. Kelly's counsel is getting the word "next" from. It is certainly not in the article. If "next" as used by Mr. Kelly's counsel means "after Mr. Kelly's acquittal," that would mean that the attorney/client relationship ended sometime in 2018 after Mr. Genson's office was closed. That is obviously not so. Yet, counsel for Mr. Kelly went even further, suggesting that the relationship "probably" went on much longer than ten years after the acquittal. Mr. Genson died in April of 2020. Presumably, counsel for Mr. Kelly would acknowledge that Mr. Genson did not maintain an attorney/client relationship with Mr. Kelly after his death.

Further, use of the word "probably" by Mr. Kelly's counsel is an odd choice. It seems that the best way for Mr. Kelly's current counsel to discover when Mr. Genson ceased representing Mr. Kelly would be to ask her client. If she wanted to present any meaningful support for her allegations about Mr. Genson's representation, she would do what the Seventh Circuit requires for someone making factual allegations in a motion in which they are the proponent: provide a supporting affidavit from the client, which asserts the claimed facts. This is

---

However, the fact that counsel's assertion is incorrect suggests that this claim is the result of assumption rather than research.

the standard procedure for the party bringing the motion. Counsel for Mr. Kelly does not do that. Nor could she. Mr. Kelly knows very well that there was no further representation by Mr. Genson following his acquittal.

Instead, counsel grasps at a single ambiguous statement of a terminally ill and now deceased man.

> "I *didn't* facilitate him. He had already done what he'd done," Genson said. "I did facilitate him in the sense I kept him out of trouble for 10 years. I was vetting his records. I listened to them, which ones would make a judge mad."

*Id*. (emphasis added). Mr. Kelly's motion for severance implies that, based solely on that statement, this Court should somehow infer that Mr. Genson and Mr. Kelly maintained an attorney/client relationship for a decade *following* Mr. Kelly's acquittal. This claim is made without any statement from Mr. Kelly that even hints that such a relationship existed. That inference is wholly unsupported by the interview. The interview does not come off as one where Mr. Genson is contemporaneously examining records in an effort to precisely recount the time period of his attorney/client relationship with Mr. Kelly. Even if one were inclined to take "ten years" as a definitive and accurate statement as to the length of representation, that would mean that the attorney/client relationship ended in 2012. That is the same year that Mr. Glozman was first employed by another attorney in Mr. Genson's office *as a law clerk*, not even a full-time permanent employee. At the time, there is no indication that the other attorney (and to an even lesser extent, his law clerk) had any dealings with Mr. Kelly. Indeed, there does not appear to have been any reason for Mr. Genson to have any dealings with Mr. Kelly during this time. Hence, without some supporting statement from Mr. Kelly, the presentation of this allegation is both troubling and transparent. It is troubling because, without any supporting statement from Kelly, these allegations can only be described as reckless and ill considered. It is transparent

6

because it is an obvious attempt to manipulate a way around this Court's ruling regarding the trial date in this case.

Mr. Glozman has no idea what Mr. Genson meant by "vetting" in the above quoted passage. Nor does Mr. Glozman have any independent knowledge of how long Mr. Kelly and Mr. Genson's attorney/client relationship lasted. Mr. Glozman does not recall having any contact with or observing anyone in Mr. Genson's office having contact with Mr. Kelly during his time there. Mr. Glozman does not know and has never spoken with Individual A.[2] Furthermore, it seems entirely likely that Mr. Genson, (who again, was in the final stages of terminal cancer) was referring to the time when Mr. Kelly's state charges were pending. For example, in discussing what he "vetted," Mr. Genson referenced the song *Ignition*:

> "I was riding in the car, listening to a song and said, 'Are you crazy? This is all I need.' He re-wrote it."
> …
> "Ignition," Genson said. "It's a song related to a guy driving around in a car with his girlfriend. It was originally a high school instructor in a class teaching people how to drive a car. I changed the words."

*Id*. Mr. Genson's use of the word "records" seems to be referencing, not business records, but *music* records. By vetting, Mr. Genson seems to mean, "listening to his music for anything that might be used against him in Court." According to Google, Ignition was released by Mr. Kelly in 2002. *See* R. Kelly, *Ignition* (Jive Records 2002). Thus, the context does not suggest any vetting that went on following the acquittal. In Mr. Kelly's attempt to stretch out the length of his attorney/client relationship with Mr. Genson to get closer to Mr. Glozman's date of hire, he relies heavily on an imprudent interview, given by a gravely ill lawyer, telling stories about a six-year

---

[2] Mr. McDavid is not the proponent of this motion. Hence, no affidavit from Mr. Glozman is necessary at this time. However, should the Court request one, it will be immediately and gladly provided in support of the statements noted above.

7

long case that ended over a decade before. Once again—hardly the portrait of the thoughtful pursuit of truth.

B.    **MR. GLOZMAN HAS NO CONFIDENTIAL INFORMATION REGARDING MR. KELLY.**

Mr. Kelly argues in his severance motion that "[a]n attorney client relationship between Kelly and Genson was imputed to Glozman who was Genson's associate." Dkt 196. The motion further states "[b]ased on the foregoing, any privileged information conveyed by Kelly to his prior attorney, Edward Genson, was also received by Genson's associate Mr. Glozman, either actually or constructively." *Id*. That is simply not how the law works in this area at all.

This is a case involving successive representation by a former firm. It is governed by rule 1.9(b) of the Illinois Rules of Professional Ethics. Illinois Rule 1.9(b) is not unique or different from the model rules in any meaningful way.

> "(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
> (1) whose interests are materially adverse to that person; and
> (2) *about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c)* that is material to the matter; unless the former client gives informed consent."

IL R S CT RPC Rule 1.9 (emphasis added).

In case it is not already clear from the above, Mr. Glozman has no confidential or privileged information regarding Mr. Kelly's state case (other than what has been discovered as part of the instant indictment). He has never spoken to Mr. Kelly. Nor does any statement made by Mr. Genson in the 2019 interview provide anything close to a good faith basis for believing as much.

8

As the comments to Rule 1.9 make clear, this is exactly the type of situation where Mr. Glozman is absolutely permitted to represent Mr. McDavid because no conflict acknowledged under the law exists.

> "Second, the rule should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. … If the concept of imputation were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.
> …
> "Paragraph (b) operates to disqualify the lawyer only when the lawyer involved has *actual knowledge* of information protected by Rules 1.6 and 1.9(c). Thus, if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict."

Cmnts. IL R S CT RPC Rule 1.9 (emphasis added).

Mr. Kelly asserts that "in the years following Kelly's acquittal, Kelly and Genson maintained an attorney client relationship." *Id*. If that is true, counsel should be able to do better than making an allegation that seems to be based exclusively on a far-flung extrapolation from an already ambiguous statement in an interview given under what was obviously a hampered mental state.[3]

Mr. Kelly was simply not a client of Mr. Genson during Mr. Glozman's employ. The most consternating aspect of the allegations in Mr. Kelly's motion to sever is that all of it serves absolutely no purpose. *Even if* the Genson/Kelly attorney-client relationship could be, in some *de minimis* way (that Mr. Kelly's motion does not establish), stretched into a time when Mr.

---

[3] Whatever one might say about Mr. Genson, during his prime, he was not an attorney known for having "loose lips" with the press.

Glozman worked for Mr. Genson, Rule 1.9(b) still applies. Mr. Glozman did not have any privileged conversations with Mr. Kelly nor did he obtain (or have any reason to obtain) confidential information. *United States v. Sanders*, No. 2:08-CR-022-JVB-PRC, 2010 WL 4876735, at 3–4 (N.D. Ind. Nov. 22, 2010) ("Although in this case Defendant Scott's interests are materially adverse to Defendant Sanders' interests, Sanders' argument fails on the second prong of Indiana Rules of Professional Conduct 1.9(b) because there is no basis or showing that Scott or his attorney Lawrence W. Levin in fact actually acquired any protected information about Sanders."); *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 303 (5th Cir. 2009) ("Under Texas Rule 1.09(b), Kennedy was conclusively disqualified by imputation from representing D'Andrea only while he remained at Jackson Walker. When Kennedy ended his affiliation with Jackson Walker without personally acquiring confidential information about MindPrint, his imputed disqualification also ended.").

If one is going to attack someone's integrity, it should at least be for a reason. Yet, legally, Mr. Glozman has no conflict. Hence, nothing about him or Mr. Genson could serve as the basis for severance. Mr. Glozman does not have any special knowledge that could put Mr. Kelly at a disadvantage. That is the simple reality of the law as it applies to this situation. All of these claims about Mr. Genson served no purpose under the law.

    **C.    Allegations Regarding Mr. McDavid**

As counsel for Mr. McDavid told Mr. Kelly's lawyer, Mr. McDavid is not going to present his defense to anyone prior to the beginning of trial. He is not required to and would be foolish for doing so. Nonetheless, he will say that which the evidence plainly demonstrates to anyone who actually looks at it: Derrel McDavid never took a dollar from Robert Kelly without authorization and justification. As with the claims regarding Mr. Genson and Mr. Glozman,

10

counsel for Mr. Kelly uses conjecture, bare allegation, and conclusory statements to stand in for that which is missing in the motion to sever: citation to any actual exhibits or proven facts about Mr. McDavid's handling of his client's finances.

      Counsel for Mr. Kelly has indicated a difficulty in getting through all of the discovery. Perhaps that is the explanation for these claims about Mr. McDavid. If not, it is hard to imagine from whence these assertions find their genesis. Mr. Kelly's motion ignores detailed audits that were conducted regarding all of Mr. Kelly's accounts and Mr. McDavid's handling of them. Nor does it reference the independent lawyers who represented Mr. Kelly regarding his contractual relationship with Mr. McDavid and counseled him about the contract's terms and the settlement of the subsequent lawsuit. When an individual has his own independent legal team examining a contract's terms at the time of execution and negotiating a settlement upon its subsequent breach, it is rather hard to divine a sense in which the individual was somehow tricked by the contract process. If Mr. Kelly had evidence contradicting this commonsense reality, he would no doubt present it. The fact that he does not speaks volumes.

      Mr. McDavid will not take the time to dignify each of Mr. Kelly's allegations, which are made without citation to any exhibit or statement from Mr. Kelly, with a response. What he will do is remind the Court of the simple proposition that the proponent of a severance motion bears the burden of proving the allegations alleged to justify severance. That is not a controversial point of law. Yet, when it comes to proof supporting any of the allegations about Mr. McDavid, Mr. Kelly's motion cites none. This is because reference to actual evidence will not possibly aid Mr. Kelly's cause in contending some sort of theft or bad faith by Mr. McDavid. There was none.

11

Will there be antagonistic defenses? Mr. McDavid does not have any reason to believe there should be. But it is always possible. Should there be a severance? Maybe. Nonetheless, one cannot manufacture a basis for such a severance by making reckless accusations in the absence of actual proof. The law does not allow that; thankfully so.

## CONCLUSION

Mr. McDavid does not object to Mr. Kelly's motion to sever. However, severance should not be granted, nor should any other action be taken by this Court, based on unsupported and unproven allegations.

Respectfully submitted,

/s/ Beau B. Brindley
*An Attorney for Derrel McDavid*

/s/ Vadim A. Glozman
*An Attorney for Derrel McDavid*

/s/ Blair T. Westover
*An Attorney for Derrel McDavid*


Beau B. Brindley
LAW OFFICES OF BEAU B. BRINDLEY
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 765-8878


Blair T. Westover
LAW OFFICES OF BEAU B. BRINDLEY
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 765-8878


Vadim A. Glozman
LAW OFFICES OF VADIM A. GLOZMAN

53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 726-9015

## CERTIFICATE OF SERVICE

I, Beau B. Brindley, an attorney for Defendant Derrel McDavid, hereby certify that on this, the 18th day of May, 2022, I filed the above-described document on the CM-ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

Respectfully submitted,

*/s/ Beau B. Brindley*

LAW OFFICES OF BEAU B. BRINDLEY
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 765-8878