UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 19 CR 567 |
| v. | Honorable Harry D. Leinenweber |
| ROBERT SYLVESTER KELLY, aka "R. Kelly," DERREL McDAVID, and MILTON BROWN, aka "June Brown" | |

## GOVERNMENT'S *SANTIAGO* PROFFER AND MOTION TO ADMIT EVIDENCE PURSUANT TO FED. R. EVID. 801(d)(2)(E)

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, moves to admit certain statements against defendants Robert Sylvester Kelly, Derrel McDavid, and Milton Brown, pursuant to Fed. R. Evid. 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## INTRODUCTION

The defendants are charged with participating in conspiracies involving obstruction of justice and the receipt of child pornography in the form of video recordings. In this submission, the government provides an overview of the charged conspiracies that will be established at trial, describes the law governing the admissibility of coconspirator statements, and outlines some of its evidence establishing the charged conspiracies. Based on the following, the government seeks admission of statements pursuant to Rule 801(d)(2)(E) and requests a pretrial ruling of admissibility from the Court, in accord with *United States v. Santiago*, 582 F.2d

1128, 1130-31 (7th Cir. 1978), and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all the government's evidence that would go to show the existence of the charged conspiracies or all the coconspirator statements that were made in furtherance of the charged conspiracies. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the obstruction of justice conspiracy described in Count Five and the related receipt of child pornography conspiracy described in Count Six, and the participation of the coconspirators. As a result, this submission does not list all the government's evidence and witnesses, nor does it provide all the evidence that will be presented by identified witnesses.

## BACKGROUND

### *Overview of the Charged Obstruction of Justice Conspiracy*

The superseding indictment alleges that, from approximately 1996 to 2001, Kelly engaged in sexual contact and sexual acts with minors, including Minor 1, Minor 3, Minor 4, Minor 5, and Minor 6. R. 93. As part of this abuse, Kelly recorded himself engaged in sexually explicit conduct with minors on videotape. *Id.* at 1-4; 8, 17-19. During this time, from approximately 1991 until 2014, Kelly and/or one of Kelly's businesses, employed McDavid as Kelly's business manager. *Id.* at 5. As a business manager for Kelly, the services McDavid provided to Kelly and for Kelly

included protecting Kelly's image, reputation, and assets when victims of Kelly's sexual abuse pursued or were part of civil actions. *Id.*

Count 5 of the superseding indictment charges Kelly and McDavid with conspiracy to obstruct justice relating to child exploitation and child pornography. R. 93. McDavid and others knew of Kelly's sexual misconduct with minors, and knew that Kelly recorded himself engaged in such conduct on videotape. *Id.* at 8. In approximately 2001, Kelly and McDavid learned that multiple such videos were missing from Kelly's collection, including Video 2, Video 3, and Video 4. *Id.* After making this discovery, Kelly, McDavid, and others, conspired to conceal and cover up evidence, including videos, relating to Kelly's sexual contact and sexual acts with minors. *Id.* Kelly, McDavid, and others, also agreed to intimidate, threaten, and pressure, others to falsify and make false entries in records and documents related to Kelly's sexual misconduct with minors. *Id.* at 10. To accomplish this, among other things, Kelly and McDavid agreed to pay others to collect and return incriminating videotapes, and to keep silent about Kelly's sexual relationship with Minor 1, among others. *Id.* at 8-13. Further, Kelly paid McDavid to ensure McDavid would continue to conceal and cover up evidence of Kelly's sexual misconduct with minors. *Id.* at 10. Based on these and other facts, Kelly and McDavid are charged with conspiracy to obstruct justice relating to child exploitation and child pornography (Count 5).

*Overview of the Receipt of Child Pornography Conspiracy*

Count 6 of the superseding indictment charges Kelly, McDavid, and Brown with conspiracy to receive child pornography. R. 93. Brown, like McDavid, provided

3

services to and for Kelly for years. Count 6 realleges certain paragraphs from Count 5, including those referencing Kelly's sexual conduct and sexual acts with minors and Kelly's recording of those sexual encounters on video. R. 93 at 5, 6, 17. Kelly, McDavid, Brown knew of Kelly's recorded sexual activity with minors and, when they discovered that certain of the videotapes were missing, they paid others to recover and return certain videotapes. *Id.* at 8, 17. Specifically, between August 2001 and April 2007, defendants conspired with each other, Individual A, Individual B, and others to receive Video 2, Video 3, and Video 4. *Id.* at 17.

## ARGUMENT

### I. Governing Law

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Admission of such co-conspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1] Under *Santiago*, the trial court must preliminarily determine whether statements by a co-conspirator of the defendant will be admissible at trial under

---

[1] No Sixth Amendment confrontation issues are posed by the use of a non-testifying co-conspirator's statements, offered for their truth against a defendant, as such statements are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006), and *Crawford v. Washington*, 541 US. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (co-conspirator statements are neither hearsay nor testimonial).

Rule 801(d)(2)(E). In making this determination, the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Santiago*, 582 F.2d at 1143 (internal quotations omitted); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the court determines that the statements are admissible, the jury/court may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

### A. Existence of and Membership in the Conspiracy

In making the initial admissibility determination under the *Santiago* criteria, a court can consider the statements in question (those to be admitted). *See Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987). While a court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. *See id.* at 178, 180; *see also Harris*, 585 F.3d at 398-99. Instead, there must also be some supporting evidence or facts corroborating the existence of the conspiracy and the defendant's participation in the conspiracy. *See Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and the defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-755 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy charge, such as a meeting of the minds and an overt act. *United States v. Coe*, 781 F.2d 830, 835 (7th Cir. 1983). The government need only establish the existence of a joint venture for an illegal purpose and participation in the joint venture by the defendant and the maker of the statement at issue, as well as that the statement was in furtherance of the venture. "[I]t makes no difference whether the declarant or any other "partner in crime" could actually be tried, convicted and punished for the crime of conspiracy." *United States v. Gil*, 604 F.2d 546, 549-50; *see also Coe*, 718 F.2d at 835.

Although, as discussed above, there is a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every co-conspirator or schemer. *Longstreet*, 567 F.3d at 919; *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). A defendant

(or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point").

Finally, the government is neither required to prove the identity of the declarant nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a co-conspirator. *Id.*

### B.  "In Furtherance" of the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "co-conspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" to be admissible under the co-conspirator exception. *Id.* at 937 (internal marks omitted).

7

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630, at *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);

- to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

- to plan or to review a co-conspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a co-conspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from co-conspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

- to recruit potential coconspirators. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all co-conspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 Fed. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## C.     Alternative Bases for Admissibility

Many statements described herein and sought to be admitted against the defendant are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

### 1.     A Defendant's Own Statements

A defendant's own admissions are admissible against him pursuant to Fed. R. Evid. 801(d)(2)(A), without reliance on the coconspirator-statement rule. *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is … the party's own statement, in either an individual or a representative capacity." Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements

9

against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997); *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

### 2.    Agency Statements

Statements made by a party's agent or employee on a matter within the scope of the employment relationship while it existed are admissible against him pursuant to Rule 801(d)(2)(D). *United States v. Chappell*, 698 F.2d 308, 311-312 (7th Cir. 1983).

### 3.    Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. An example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

Additionally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[2] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the

---

[2] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

*Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### 4. Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming the district court's decision to admit a co-defendant's inculpatory statement which

also incriminated the defendant because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *United States v. Hamilton*, 19 F.3d 350, 356 (7th Cir. 1994). *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

## II. The Evidence Demonstrating the Existence of the Charged Conspiracies and Defendants' Participation in the Conspiracies[3]

The government's evidence of the charged conspiracies and defendants' participation in them consists of, among other things: (1) witness testimony including from unindicted co-conspirators and Kelly's minor victims; (2) videos containing child pornography; (3) polygraph examination records; (4) travel records; (5) bank and business records; and (6) the false documents created as a result of defendants' intimidation, threats, and pressure to persuade others to conceal and cover up evidence of Kelly's participation in sexual misconduct with minors.

### A. Testimony of Minor 1, Minor 4, and Minor 5

The government anticipates testimony at trial from minor victims referenced in the indictment that Kelly engaged in sexual acts with them when they were under 18 years old. These sexual encounters took place at various times from approximately 1996 to 2001. The evidence will establish that, on many occasions, Kelly recorded

---

[3] The government has tendered to defendants all of the statements and reports of interview to date of the witnesses referred to in this section. The records and other documents referenced in this section have been produced to defendants in discovery.

himself engaging in these sexual encounters. The testimony that the government anticipates that these minors will provide is summarized below.

### 1.    Minor 1

Minor 1 met Kelly around 1997 or 1998 when she was about 13 or 14years old. Kelly began having sex and engaging in sex acts with her at that time. From the beginning, Kelly told Minor 1 that she was not allowed to tell anyone about the sexual activity. Kelly told Minor 1 that if anyone asked about their relationship being sexual, she should completely deny it and act offended that anyone would ask such a thing. They engaged in sex hundreds of times, in many different places, including his homes, recording studios, tour buses and hotels. Kelly instructed Minor 1 how to have sex with him, and with other girls and women, including Individual D, at the same time. Kelly continued to engage in sexual acts with Minor 1 through and after she turned 18.

When Minor 1 and Kelly engaged in sex acts, Kelly often recorded them, including by using a camcorder with VHS tapes. Kelly kept his video camera and the VHS tapes with the recordings in his gym bag and on a shelf at his house, hidden behind other tapes. Kelly sometimes played tapes depicting pornography while he and Minor 1 engaged in sex acts. Some of the tapes were of Minor 1 and Kelly, and some depicted Kelly having sex with other people. Kelly took the gym bag with the tapes almost everywhere he went, and only let certain people he trusted carry the bag. Brown was one of those people whom Kelly trusted to carry the bag. According

13

to Minor 1, Brown knew that Kelly was having sex with Minor 1 when she was under 18years old.

Video 1, Video 2, and Video 3 contain footage of Minor 1 and Kelly engaging in sexual activity at Kelly's house on West George Street in Chicago when she was under 18years-old. In Video 1, Minor 1 is wearing a distinctive necklace. Minor 1's passport at the time contained a photo of Minor 1 wearing the same necklace.[4] Minor 1 discussed the passport photograph with Kelly, his lawyers, and McDavid because it showed her wearing the same necklace visible in Video 1. Kelly or one of his lawyers took the necklace from Minor 1. Additionally, Kelly created other videos depicting him and Minor 1 engaging in sexual activity together, as well as with other girls, including Minor 5, Minor 6, and Individual D, all while Minor 1 was under 18 years old.

In or about 2000, when Minor 1 was about 15 or 16 years old, government agencies began investigating allegations that Kelly was sexually abusing Minor 1. Kelly instructed Minor 1 on how to act and what to say if she was questioned. In or around December 2000, law enforcement officers from the Chicago Police Department questioned Minor 1 about sexual contact with Kelly. During the CPD interview, Minor 1 followed Kelly's instructions and falsely denied the allegations of Kelly's sexual misconduct. CPD documented that information in a report.

Around late 2001 or early 2002, when Minor 1 was 17 years old, her family members learned about Video 1, and some of them saw the tape. Minor 1 continued

---

[4] Minor 1's passport was issued on or about March 16, 1998, when she was 13 years old.

to deny the sexual aspects of her relationship with Kelly to family and friends. However, McDavid set up a meeting at a hotel with Minor 1, her parents, Kelly and McDavid. During the meeting, Minor 1 revealed to her parents that Kelly and Minor 1 had been engaging in sex acts when she was a minor. Kelly told Minor 1 and her parents that they were either with him or against him, which Minor 1 interpreted to mean that if they all denied the allegation regarding Kelly engaging in sex with Minor 1 when she was underage, she wouldn't have to worry about what could happen to her family. Shortly after the meeting at the hotel, during the time that law enforcement was investigating Video 1, Kelly sent Minor 1 and her parents to the Bahamas and to Mexico for several weeks to get away from everyone who was asking questions about Video 1, including law enforcement.

When Minor 1 and her parents returned to the Chicago area, Kelly isolated Minor 1 and placed her in various hotels. Minor 1 was not allowed to talk to anyone other than Kelly and his associates and her phone calls were monitored. This continued until Minor 1 and her family agreed to support Kelly and deny to law enforcement that it was Minor 1 on Video 1. Kelly was very rich and powerful at this time in his career, and his implied threats of either being with him or against him scared Minor 1's family very much. During the state's investigation, Minor 1 and her parents were subpoenaed to testify before the state's grand jury. Kelly sent one of his lawyers to sit in the grand jury room where and when they testified. Minor 1 and her parents knew that the attorney was there to report back what they said. Each of them falsely testified that Minor 1 was not the girl in Video 1.

Minor 1 had conversations with McDavid about Kelly having sex with her. McDavid was present when Kelly's team strategized about what to do with Video 1 and its depictions of Kelly engaged in sexual activity with Minor 1. Minor 1 will also describe McDavid's participation in what to do with the necklace and its depiction in both Video 1 and Minor 1's passport photo.

In 2008, just prior to and during the state court trial involving Video 1, Kelly isolated Minor 1 from her family and friends and controlled her movements and contacts with others. Kelly's lawyers prepared Minor 1 on what to say if she were called as a witness. Ultimately, Minor 1 did not testify at the trial and the jury acquitted Kelly. Minor 1, who was over 18 years old at the time of the trial, continued to have a relationship with Kelly after the trial concluded. The relationship was sexual in nature and abusive. Minor 1 ended her relationship with Kelly in approximately 2010, but she continued to have contact with him from time to time after that date. In approximately 2014, for example, Minor 1 asked Kelly for help with rent payments. At first, Kelly refused. Minor 1 reminded Kelly who she was, all that she had given up for him, and what she knew about their sexual history together. Kelly thereafter made monthly payments to Minor 1 by check between 2014 and 2015. Some of the checks said "Settlement" on them even though Minor 1 never had a settlement agreement with Kelly.

### 2. Minor 4

Kelly engaged in a sexual relationship with Minor 4 from 1999 to 2001 when Minor 4 was 16 to 18 years old. These sexual encounters occurred numerous times

and in numerous locations including Kelly's recording studio in Chicago and hotels. Once, when Minor 4 was 16 years old, Brown told Minor 4 that Kelly wanted Minor 4 to get a hotel room and wait there for Kelly. Brown wanted Minor 4 to reserve the hotel room herself. Minor 4 told Brown that she could not because she was only 16 years old. Minor 4 got the hotel room key by picking it up at Kelly's recording studio. According to Minor 4, Kelly recorded himself engaging in sex acts with her and, on at least one occasion, Kelly recorded himself having sex with Minor 1 and Minor 4 together.

### 3. Minor 5

In 1998, when Minor 5 was approximately 14 or 15 years old, Kelly engaged in sex acts with her. Kelly had threatened Minor 5 that he would tell her mother she kissed a boy. Minor 5 felt both fear of and loyalty to Kelly after their first sexual encounter. Kelly told Minor 5 that they "all had secrets now" after their first sexual encounter. After the first sexual encounter, and continuing until Minor 5 was 17 years old, Kelly engaged in sexual acts with Minor 5, together with Minor 1, at least 100 times. These sexual encounters took place at Kelly's homes, his recording studio, his tour bus, and hotels. These encounters involved Kelly and Minor 5 alone, Minor 5 and Minor 1 together, or Minor 5 and other girls under the age of 18, including Minor 6.

Kelly often videotaped himself engaging in sex acts with Minor 5 and Minor 5 with others, including with Minor 1 and Minor 6. Minor 5 saw video cameras and tripods everywhere at Kelly's George Street house, at his recording studio, and on

tour buses. Minor 5 was aware of a false wall in a room at the George Street house that led to a room full of videotapes. Kelly also kept videotapes in his gym bag.

In late 2001, CPD interviewed Minor 5 and her mother and showed them still images from Video 1. Minor 5 identified Minor 1 in the video as Minor 1. Minor 5 then received a subpoena to testify in the state grand jury. Minor 1 told Kelly about the subpoena. Kelly told Minor 5 that the police were making him out to be the bad guy and that she should say that it was not Minor 1 in Video 1. Minor 5 testified truthfully in the grand jury that she recognized Minor 1 in the photographs that the prosecutor showed her but she also falsely testified that she did not know of any sexual relationship between Kelly and Minor 1.

Minor 5 met with Kelly and Minor 1 during Kelly's 2008 state trial. Kelly discussed the possibility of Minor 1 having to testify. Kelly explained to Minor 1 and Minor 5 that they could beat a polygraph examination by believing the lie being told because there was nothing wrong with the sexual activity they engaged in when the girls were under 18 years old. Kelly encouraged Minor 1 to try and convince Minor 5 to deny that it was Minor 1 on the tape and to deny that the three had sexual experiences together.

## B. Testimony of Unindicted Co-conspirators Named in the Superseding Indictment

The government anticipates that Individual B, Individual C, and Individual D will testify at trial regarding their participation in the charged conspiracies. The testimony that the government anticipates from these individuals is summarized below.

18

### 1. Individual B

Individual B met Kelly in the 1990s. Individual B did some concert promotional work for Kelly and some work while Kelly was on tour. Individual B also managed a music group signed to Kelly's record label and, as a result, Individual B spoke with Kelly, McDavid, and Brown about various matters related to the group.

In approximately 2001, when Individual B was living in Kansas City, Kelly called Individual B and told him that Kelly needed something recovered and that he would pay Individual B to do it. Later, McDavid and Individual A, a private investigator working on behalf of Kelly, called Individual B and explained that they needed Individual B to recover some videotapes for Kelly and would pay him a reasonable amount to do so. Shortly thereafter, McDavid and Individual A met with Individual B at a hotel in Kansas City where they informed Individual B that Individual D stole a videotape or videotapes from Kelly and that Kelly wanted them back. Individual B agreed to help Kelly recover the property. Under the agreement, Individual B was to recover one tape from Individual D in return for $100,000, and Individual B was to recover one tape that Individual D had stolen but did not have any more in return for $1,000,000.

Individual B later entered into a written contract with Individual A, who acted on Kelly's behalf, concerning the recovery of the Individual D videotape that was no longer in her possession. The contract was titled "Agreement and Reward for Expenses." The contract listed $100,000 plus expenses as the fee to be paid to Individual B even though the previous agreement was for $1,000,000. McDavid was

19

present when Individual B signed the contract. Individual A and McDavid explained that the contract was for a lesser amount to avoid raising suspicion. The conditions for payment required Individual B to pass a polygraph examination that Individual B knew of no other copies of the videotape.

Individual B learned from Individual D that she gave a videotape that depicted Kelly having sex with a young girl to a man in Georgia. Individual B provided Individual A with the man's name and, in turn, Individual A gave Individual B the man's address. Individual B drove to Georgia and recovered from the address Individual A gave him a videotape that depicted Kelly engaged in sex acts with a young girl. Individual B made several copies of the videotape. Individual B watched the tape and he observed two scenes of Kelly engaged in sexual activity with Minor 1. The first scene depicted Kelly and Minor 1 engaging in sexual activity on a black-and-white checkered floor (the video referred to in Count Two, Video 2). The second scene depicted Kelly and Minor 1 engaging in sexual activity in a bedroom (the video referred to in Count Three, Video 3).

Individual B returned to Kansas City and met with Individual A and McDavid at a hotel. There was a polygraph examiner with Individual A and McDavid at the meeting. Individual B gave McDavid and Individual A only one of the copies of the videotape that Individual B recovered from Georgia and retained the other copies. The videotape Individual B obtained in Georgia did not contain a separate video of Kelly, Individual D, and Minor 1 engaged in sexual activity (the video referred to in Count Four, Video 4). Individual B asked for payment. The request was refused and

20

Individual B was accused of making copies of the video and keeping the copies. Individual B admitted that he made copies but refused to submit to a polygraph examination. The meeting became contentious. McDavid and Individual A told Individual B he could get in trouble for possessing child pornography and accused him of trying to extort Kelly. Individual B remarked that Kelly could "go down" for having sex with young girls.

Kelly called Individual B after the meeting. Kelly asked Individual B to smooth things over with McDavid and Individual A and he would get paid. Individual B traveled to Chicago and met with Kelly, McDavid, and Brown at Kelly's recording studio. Kelly questioned Individual B regarding the videotape that he recovered, and told Individual B that his (Kelly's) life was on the line because he was being investigated for a sexual interest in underage girls.[5] Individual B agreed to turn over another copy of the tape he recovered, but did not tell Kelly that he had even additional copies of the video. Kelly said that McDavid would give him some money as a show of good faith. McDavid gave Individual B $10,000 in cash before Individual B returned to Kansas City.

Individual B met Individual A and McDavid again in Kansas City and submitted to a polygraph examination. The examiner asked Individual B whether he made additional copies of the videotape. Individual B said no. The polygraph examiner determined that Individual B passed the polygraph examination, even though Individual B had, in fact, made additional copies of the videotape.

---

[5] As explained below, at this time law enforcement was investigating Kelly regarding Video 1.

Individual B nonetheless turned over another copy of the tape he recovered in Georgia and McDavid and/or Individual A gave Individual B $75,000 cash. Over the next years, until approximately 2008, Individual B received large sums of money every year or every other year as payments towards the $1,000,000 he was owed. Individual B never received the full amount.

In approximately mid to late 2002, Individual B met with Kelly and Brown at Kelly's home in Olympia Fields. Brown placed a videotape into a VCR and, together, they watched a scene which showed Kelly, Individual D, and Minor 1 engaged in sexual activity (the video referred to in Count Four, Video 4). Kelly asked Individual B the location of the copy of the videotape that contained that footage since the videotape that Individual B recovered from Georgia did not contain this scene. Individual B returned to Kansas City and spoke with Individual C about this missing scene. Individual C told Individual B that he had a copy of a tape with Video 4 and that he knew he would receive money if he returned the tape to Kelly. Individual C showed Individual B the videotape with this footage and Individual B recorded some of it on his cell phone.

At some point in the lead up period to Kelly's 2008 state court trial regarding Minor 1 and Video 1, Individual B met with Kelly and McDavid at Kelly's home in Olympia Fields. Individual B denied having any copies of tapes depicting Kelly engaged in sex acts. Kelly told Individual B that he (Individual B) would be "dead" if another tape of Kelly engaging in sex acts with a minor surfaced. Kelly further stated that Minor 1 and her family would not testify against him because he relocated

22

Minor 1 and paid off her family. Kelly expressed concern about Individual B disclosing information about the tapes. The following day, Individual B met with McDavid, who gave Individual B approximately $100,000 cash.

During Kelly's state trial, in approximately June 2008, Individual B contacted news media outlets and advised that he was holding a press conference about Kelly. Individual B wanted Kelly to pay the balance of the $1,000,000 owed to him and he wanted Kelly and his team to know that he was willing disclose what he knew about the tapes containing Kelly engaged in sexual acts with Minor 1 their agreement about the recovery of the tapes. Later that day, Kelly asked Individual B not to hold a press conference. That night, Brown gave Individual B approximately $10,000 to $20,000 cash. The next day, Individual B met with McDavid, who paid Individual B approximately $130,000 to $140,000 in cash. Individual B then cancelled the press conference.

### 2. Individual D

Individual D met Kelly in late 1997 or early 1998 in Georgia. They began a sexual relationship a short time thereafter. Kelly liked to videotape them having sex. Kelly convinced Individual D to have threesomes with him and other girls and women. Individual D engaged in sexual acts with Kelly and Minor 1 on at least three occasions when Minor 1 was under 16 years old. The first time occurred in a room in the lower level of Kelly's residence on George Street. Kelly set up a camera before the three of them began to engage in sex acts. Individual D engaged in threesomes with

Kelly and Minor 1 in other places, including on the basketball court in the George Street residence, and in a trailer. Each time Kelly filmed the encounter.

Kelly kept a duffle bag with him wherever he went. Individual D looked inside the bag and saw that it was full of VHS tapes. In approximately 2001, Individual D search through the bag of tapes until she found one that contained footage of Kelly, Minor 1, and herself engaging in a threesome. The tape had three different sex scenes on it. The first depicted Kelly and Minor 1 in a room with a black and white chess or checkerboard pattern on the floor (Video 2). The second depicted Kelly and Minor 1 in a bedroom (Video 3). The third depicted Kelly, Minor 1, and Individual D having sex in a room with wood walls on the lower level of Kelly's George Street residence (Video 4). Shortly after taking the tape, Individual D gave it to Individual C, who lived in Kansas City. Later, Individual D moved to Georgia, where she remained in contact with Kelly through 2007.

In early 2007, Individual D learned that Individual C still had the videotape containing Video 2, Video 3, and Video 4. Individual D knew by this point that a different videotape of Kelly engaging in sex acts with Minor 1 (Video 1) had been leaked to the public. Individual D was concerned that the tape with her engaging in sex acts with Minor 1 and Kelly would also be leaked to the public. Individual D reached out to Kelly about the videotape through an acquaintance. Kelly flew Individual D to Chicago to meet at his home in Olympia Fields. During the meeting Kelly asked Individual D questions about the videotape and offered her $250,000 to recover it from Individual C. Kelly said that Individual D could divvy up that money

24

however she needed to get the tape back. Kelly further stated that McDavid would handle all of the arrangements.

After the meeting, Individual D contacted Individual C. Individual C agreed to fly to Chicago and return the tape. Brown met Individual C when Individual C arrived in Chicago. Brown drove the three of them, Brown, Individual C, and Individual D, to an attorney's office on Jackson Street near the federal courthouse in Chicago. Individual D and Individual C met with McDavid in an attorney's office. McDavid and Individual D watched tape containing Video 2, Video 3, and Video 4. According to Individual D, McDavid was most interested in the parts that showed Minor 1 and the multiple references on the tape to Minor 1's "14-year-old" body parts. McDavid kept the videotape. McDavid asked Individual D and Individual C about whether there were other copies of the tape. McDavid then took Individual D to take a polygraph test in that same building. The polygrapher asked Individual D questions about to whom she had given the tape to and if any copies of the tape had been made. Individual D passed the polygraph examination. Individual D learned that Individual C took a similar examination but failed because, as Individual D understood it, Individual C had made a copy of the tape before travelling to Chicago. After the examinations, McDavid gave Individual D and Individual C $20,000 each in cash. McDavid stated that they would each receive an additional $80,000 when they returned with a copy of the tape that Individual C made. McDavid said he would pay Individual D the remaining $50,000 (of the $250,000 Kelly promised) after Kelly's state trial.

Later in 2007, Individual D and Individual C returned to Chicago where they met with McDavid again. Individual C brought with him another copy of Video 2, Video 3, and Video 4 and gave it to McDavid. Individual D and Individual C each took polygraph examinations, and the each passed the examinations. McDavid gave Individual C $80,000, but only gave Individual D $50,000 in cash. McDavid said that, if it wasn't for Individual D, they would not have had to pay Individual C $100,000.

Individual D returned to Chicago a third time. Individual D took a third polygraph examination during this visit. Individual D was questioned about matters unrelated to the videotape. The polygraph examiner determined that Individual D failed the polygraph examination. McDavid accused Individual D of being disloyal and threatened her. McDavid ultimately gave Individual D the $30,000. McDavid told Individual D that she would have to talk to a lawyer and deny ever having sex with Minor 1. McDavid waited in the hallway while Individual D spoke to a lawyer who later turned over a summary of the interview to Kelly's attorney at the time. During the interview with the lawyer, Individual D falsely denied ever having sex with Minor 1.

### 3. Individual C

Between 2000 and 2004, Individual C received a VHS tape from Individual D via mail service. Individual C watched the tape. The tape depicted Kelly engaged in sex acts with Individual D and a young girl. In or around 2007, either McDavid or Brown contacted Individual C and explained that they had information that Individual C had a copy of a videotape that they were trying to recover and that they

wanted him to travel to Chicago and return it in exchange for money from Kelly. Brown later followed-up with Individual C to make travel arrangements for the trip to Chicago. Individual C showed Individual B the videotape before going to Chicago and asked Individual B for his advice about whether he should go to Chicago. Individual C made a copy of a portion of the tape and took the copy, that is, the shorter version, to Chicago.

Individual C met with McDavid, Brown, and Individual D when Individual C arrived in Chicago. Individual C gave the tape to McDavid and Brown. McDavid, Brown, and Individual D went into a separate room with the tape. McDavid returned and said what Individual C gave them was not the original version of the tape. McDavid stated that Individual C would have to take a polygraph examination. During the examination the polygrapher asked questions regarding copies of the videotape. The polygraph examiner determined that Individual C failed the examination. Individual C admitted that he kept a full copy of the tape in Kansas City. McDavid instructed Individual C to return to Kansas and to retrieve the original videotape. According to Individual C, McDavid gave Individual C approximately $20,000 in cash to show how serious they were about wanting to get the tapes back.

Individual C returned to Chicago within days with the original videotape he received from Individual D. Individual C met with McDavid and Brown and turned over the tape. McDavid gave Individual C a hug and Brown said that Individual C had a "golden egg." Individual C took another polygraph examination where the polygrapher again asked questions about copies of the videotape. The polygraph

examiner determined that Individual C passed the examination. During the same trip, McDavid gave Individual C a bag of cash, which Individual C determined contained $80,000. Individual C told McDavid that one day he (Individual C) was going to give the money back. McDavid said not to worry about it because Kelly wanted him (Individual C) to have the money.

### 4. Minor 1's Mother

Minor 1's mother is expected to testify that she, along with Minor 1, and her husband (Minor 1's father), met Kelly through Minor 1's Mother's sister (Minor 1's aunt). This first meeting took place in approximately 1997 or 1998 when Minor 1 was in junior high school. The sister, Minor 1's aunt, was a professional singer, and she often took Minor 1 to Kelly's recording studio when she was working on music. The sister was in a romantic relationship with Kelly at the time. Around this time, Minor 1's father, who was a professional guitar player, began doing some work for Kelly as a part-time musician.

Sometime after Minor 1's introduction to Kelly, Minor 1 told her parents that Kelly was going to be Minor 1's godfather. Minor 1's mother found this strange because Minor 1 already had godparents who were chosen by Minor 1's parents. After that, however, Minor 1 continued to see Kelly and Kelly's family. The sister was with Minor 1 at times but, at other times, Minor 1 went by herself. Minor 1's mother understood that Minor 1 was spending time with her godparents (Kelly and his wife and family).

In or around 2000, the Illinois Department of Children and Family Services contacted Minor 1's mother and her husband about allegations that Kelly was having sexual contact with Minor 1. Minor 1's mother and father confronted Minor 1 about the allegations and Minor 1 denied them.

In approximately December 2001, the sister contacted Minor 1's parents and told them that she had a copy of or had seen a copy of a tape that depicted Kelly engaged in sex acts with Minor 1. Minor 1's father told Minor 1's mother that they had to meet with Kelly. Minor 1's mother and Minor 1's father met with Kelly and McDavid at a hotel. During the meeting, Kelly said he was sorry. Kelly did not state that he had sexual contact with Minor 1. Kelly said that Minor 1 and her family needed to leave town right away. Kelly and McDavid said at one point "you're with us or you're not." Kelly also said, "you're with me or against me" and that some harm would come to the family if they decided to go against him. Minor's 1 mother and father were frightened. Minor 1's mother did not want to go up against Kelly's power, money, and influence by not following what he said, and so they decided to go along with Kelly's demand and leave town.

After the meeting, Minor 1 started acting differently. Minor 1 threatened to harm herself if her parents did not go along with whatever Kelly told them to do, that is, to deny that Minor 1 was depicted on the tape. Minor 1 and her parents left town and traveled to the Bahamas and Cancun, Mexico for several weeks. Minor 1's family did not pay for the trip. During their time away, Minor 1 was in contact with Kelly, and Minor 1's father told her that he was in contact with McDavid. Minor 1's mother,

29

Minor 1's father, and Minor 1 family discussed and agreed to do whatever Kelly and McDavid told them to do regarding the tape.

Later, after the family returned to the United States, Minor 1 and her parents received subpoenas to testify in the state grand jury. Minor 1's mother met with an attorney that her husband said was hired by Kelly and McDavid. That attorney sat in on the testimony of Minor 1, Minor 1's mother, and Minor 1's father when they testified before the state grand jury. Minor 1's mother and Minor's father had agreed, before testifying in the grand jury, that they would "go along" with Kelly and deny that it was Minor 1 in the tape if asked. Minor 1's mother was shown a tape depicting Kelly engaged in sex acts with Minor 1 during her grand jury appearance and she was asked if she knew the individuals depicted. Minor 1's mother falsely testified that she did not know who the girl in the tape was.

### C.    Other Witness Testimony

#### 1.    Polygrapher 1

Polygrapher 1 is expected to testify that in or around August 2001, he received a call from Individual A about conducting a polygraph examination of an individual at a location in Kansas City. Individual A described his client as an individual in the entertainment industry from Chicago who was interested in finding out if there were any copies of a certain videotape. Polygrapher 1 understood his assignment to be testing Individual B about whether he made any copies of the tape. Polygrapher 1 presented Individual B with an examination permission/release form. Individual B

refused to sign it or provide his name and instead gave Polygrapher 1 a nickname that Polygrapher 1 wrote on the form.

Polygrapher 1 discussed with Individual A and Individual B the subject to be discussed during the examination before the examination began. They agreed that the focus of the examination would be about "The Performance Tape." Polygrapher 1 wrote this title on the form, along with the date, August 23, 2001. Polygrapher 1 listed the completed time on the bottom of the form. These notations may mean that Polygrapher 1 did not end up actually administering the polygraph examination or that he perhaps started the examination but ended it early if Individual B became non-compliant.[6]

### 2. Polygrapher 2

Polygrapher 2 is expected to testify that in or around spring or summer of 2000, or the summer of 2001, an attorney with a client in the entertainment business hired him. The attorney told Polygrapher 2 that his client made a tape of him (the client) having sex with his babysitter. Polygrapher 2's assignment was to determine if the subject of the examination, whom Polygrapher 2 understood to be the person who recovered the sex tape, made any copies of the tape. The attorney told Polygrapher 2 that he wanted to know the results right away because, if the subject passed the test, the subject would receive money. The subject of the polygraph examination was Individual B. During the examination, Individual B pulled a VHS tape from inside his pants that Polygrapher 2 understood to be the recovered tape that they were

---

[6] As noted above, Individual B is expected to testify that he refused to sit for one polygraph examination, despite the polygrapher being present.

discussing during the examination. Polygrapher 2 determined that Individual B passed the examination.

### 3.     Polygrapher 3

Polygrapher 3 is expected to testify that Kelly's attorney hired him to administer several polygraph examinations in March and April 2007. Polygrapher 3 created documents that reflect the subject of the polygraph examinations (Individuals C and D), the questions asked, and his determinations.

Polygrapher 3 administered polygraph examinations to Individual C on April 17, 2007, at a Westin Hotel in Chicago, and again on April 20, 2007. Prior to each examination, Individual C signed a consent form. During the examinations, Polygrapher 3 asked Individual C questions about a tape that Individual C possessed which depicted Kelly engaged in sex acts with a girl and Individual D. Polygrapher 3 asked Individual C if Individual C made copies of the tape. In Polygrapher 3's opinion, Individual C failed the first examination and passed the second.

Polygrapher 3 administered three polygraph examination to Individual D: (1) on March 23, 2007, at his testing lab near the federal courthouse in Chicago; (2) on April 20, 2007, at the Swissotel in Chicago; and (3) on July 26, 2009, at his testing lab. Individual D signed a consent form before each examination. During the first two examinations, Polygrapher 3 asked Individual D questions about a tape which depicted Kelly, Individual D, and a person with Minor 1's nickname having sex. Polygrapher 3 determined that Individual D passed the examinations. During the third examination, Polygrapher 3 asked Individual C whether she had more than

32

one conversation with Individual B about the tape and about money. Polygrapher 3 determined that Individual C failed the examination.

### D.    Polygraph Records

Polygrapher 1 and Polygrapher 3 created documents contemporaneous to the examinations they conducted. Those documents included dated and signed consent forms, pre-examination interview forms completed by the examiner, and the examiner's notes listing the questions asked during the polygraph examinations. Further, at least one of Polygrapher 3's consent forms, signed by Individual D, indicated that she agreed that her polygraph examination results would be released to Kelly's attorney at the time.

### E.    Records from Individual A's Business

As noted above, Individual A, on behalf of Kelly and in concert with McDavid, facilitated the recovery and return of videotapes depicting Kelly engaged in sexual acts with Minor 1. Individual A owned and operated a business. Billing records from Individual A's company reveal the following entries, which align with Individual B's testimony about his travel between Kansas City and Chicago, and dealings with McDavid and Individual A related to the recovery and return of the sex tapes:

- August 13, 2001: 10:00 AM-11:00 PM: Travel to Kansas City, MO

- August 13, 2001: 11:00 PM-12:00 AM: Conference at our hotel w/Individual K.W.

- August 14, 2001: 1:30-3:00 AM: Conference at our hotel w/Individual B

- August 14, 2001: 10:00-11:20 AM: Conference w/Individual K.W.; call from Individual B (to Individual K.W.)

- August 14, 2001: 3:30-8:30 PM: Return travel Kansas City to San Francisco

- August 21, 2001: 2:00-5:00 PM: Consultations on preparation of Reward and Expense Agreement; telephone conference (re. Individual B extortion) w/McDavid and [an individual]; conference call w/Individual B

- August 22, 2001: 9:00 AM-12:00 PM: Conference calls w/McDavid (re. funding); conference calls w/polygraphers (re. testing arrangements)

- August 22-23, 2001: 10:30 PM-6:00 AM: Travel SF to Chicago

- August 23, 2001: 9:00 AM-10:00 PM: Obtain funding from bank; travel from Chicago to Kansas City, MO; conference w/Individual B; conference w/Polygrapher 2 (PSE Examiner] and w/Polygrapher 1 (polygraph examiner); administration of PSE and polygraph tests to Individual B; further conference w/Individual B

- August 24, 2001: 12:00-2:00 AM: Telephone conference w/client

- August 24, 2001: 10:00 AM-6:00 PM: Conferences w/Individual B and w/client; return travel from Kansas City to San Francisco

Individual A's business records also include unsigned and signed versions of the "Agreement for Reward and Expenses" contract with Individual B as well as memos to file documenting Individual A's interactions with Individual B and Polygraphers 1 and 2.

### F.    Video 1, Video 2, Video 3[7]

As noted above, Minor 1 is expected to testify that she and Kelly are depicted in Video 1, Video 2, and Video 3 engaging in sexually explicit conduct. Law enforcement officers reviewed the videos and determined that they depict child pornography.

---

[7] While these videos must remain in the custody of law enforcement, they have been made available to the defense for review.

34

### G. False Documents and Entries Created as a Result of Defendants' Intimidation, Threats, and Pressure

#### 1. CPD Report of Minor 1's Interview

Minor 1 is expected to testify that Kelly began having sexual contact with her beginning around 1997 or 1998, when Minor 1 was 13 or 14-years old. When Minor 1 was about 15 or 16 years old, in or about 2000, certain government agencies began investigating allegations that Kelly was sexually abusing Minor 1. Kelly instructed Minor 1 on how to act and what to say if she was questioned. In or around December 2000, law enforcement officers from the Chicago Police Department questioned Minor 1 about sexual contact with Kelly. During the interview with CPD, Minor 1 falsely denied the allegations of Kelly's sexual misconduct and CPD documented that information in a police report. In summary, the police report states that law enforcement interviewed Minor 1, who stated that she had never been sexually abused by Kelly and that any such allegations are untrue.

#### 2. Minor 1, Minor 1's Parents, and Minor 5's State Grand Jury Transcripts

During the state's investigation leading up to Kelly's 2002 state charges related to Video 1, Minor 1, her parents, and Minor 5 testified before the state's grand jury. Minor 1 and her parents testified falsely about whether Video 1 depicted Minor 1. Minor 5 was untruthful about the fact that Minor 1 and Kelly had a sexual relationship with Minor 1 was under 18 years old. Those false statements appear in their respective grand jury transcripts.

### 3.     Memorandum of Individual D's Interview

As set forth above, Individual D is expected to testify that following her third polygraph examination on or about July 26, 2017, McDavid told her to meet with other lawyers and tell them that she never had sex with Minor 1. McDavid waited in the hallway as Individual D went in the room to meet with the lawyers and provide the false statements McDavid instruct her to provide. The attorney prepared a memorandum of interview dated July 26, 2007 documenting Individual D's false statements. In summary, the memorandum states that Individual D provided the following information:

- Individual D knew Minor 1 and had spoken to her on numerous occasions. <u>Individual D never saw Kelly in a sexual situation with Minor 1. Minor 1 was never a participant in any sexual encounter with Individual D and Kelly.</u>

- Individual D agreed to be interviewed by attorneys on July 26, 2007. <u>Individual D was not forced, threatened, or promised anything to participate in this interview.</u>

Individual D is expected to testify that the underlined information above is false and that she provided the false information at McDavid's direction.

### H.     Travel and Credit Card Records

Records from the Atlantis Resort in the Bahamas show that Minor 1 and her parents stayed there in February 2002. This was shortly after Minor 1's parents became aware of the tape and their meeting with Kelly and McDavid at which the family was told to leave town. Additionally, travel records from Customs and Border Patrol reveal that Minor 1 and her parents re-entered the United States from Nassau, Bahamas on February 9, 2002, and that they reentered the United States from

Cancun, Mexico on February 23, 2002. CBP records also show Brown returning from Nassau, Bahamas on February 1, 2002, and then from Cancun, Mexico on February 21, 2002.[8]

A representative from a travel agency is expected to testify about records related to Kelly and his companies, including Bass Productions. Those records include credit card authorization forms which document reservations the Kelly-related company made for Individual C and Individual D to travel to Chicago to meet with Kelly, McDavid, and Brown and to take polygraph examinations, including the following:

- a March 23-26, 2007 Matteson, Illinois hotel reservation for Individual D (the date of her first polygraph examination);

- an April 16-18, 2007 Westin Chicago River North hotel reservation for Brown for one suite and three rooms (Individual C's first polygraph examination was on April 17, 2007 at the Westin);

- an April 19-21, 2007 Omni Chicago hotel reservation for two rooms for Individual C and Individual D (both were in Chicago for polygraph examinations on April 20, 2007);

- an April 19-21, 2007 Swissotel Chicago hotel reservation for Brown (Individual D's second polygraph examination was on April 20, 2007 at the Swissotel); and

- a July 25-26, 2007 W Chicago hotel reservation for Brown (Individual D's third polygraph examination was on July 26, 2007).

Credit card records for accounts belonging to the same travel agency show the following charges:

- "Westin Hotels River" charges on April 17-19, 2007 (Individual C's first polygraph examination was on April 17, 2007 at the Westin);

---

[8] Neither Minor 1 nor Minor 1's mother recall seeing Brown during their overseas travel.

- Airline ticket purchase for Individual C for travel from Kansas City to Chicago on April 19, 2007 (Individual C's second polygraph examination was on April 20, 2007); and

- Omni Hotels charges with arrival and departure dates between April 19, 2007, and April 21, 2007 (the travel agency reserved rooms for Individual C and Individual D at this hotel during this time).

Additionally, credit card records for accounts McDavid show the following charges:

- Omni Hotels charges with arrival and departure dates between April 19, 2007, and April 21, 2007 (the travel agency reserved rooms for Individual C and Individual D at this hotel during this time);

- Swissotel Chicago charges with arrival and departure dates of April 19, 2007 and April 23, 2007 (Individual D's second polygraph examination was on April 20, 2007 at the Swissotel); and

- W Chicago Lakeshore charges on July 26, 2007 (the travel agency reserved rooms for Brown for a July 25-26, 2007 stay at W Chicago; Individual D's third polygraph examination was on July 26, 2007).

## I. Bank Documents

Records from various financial institutions reflect the following payments in keeping with the allegations in the superseding indictment:

- a September 2008 Bass Productions check signed by McDavid to Minor 1's father in the amount of $30,000;

- a June 30, 2009 wire payment from Bass Productions to pay Individual B to settle a lawsuit, in the amount of $125,000;

- an April 17, 2017 Bass Productions check in the amount of $200,000 to Brown, which was cashed the same day (as noted above, Individual C and D each received $20,000 in cash on April 17, 2007, and $80,000 on April 20, 2007);

- monthly payments from January 2014 to October 2015 from Kelly's businesses to Minor 1 in the amount of $1,150;

- an August 2014 wire transfer from Kelly to McDavid in the amount of $80,000; and

- a December 2015 wire transfer from Kelly to McDavid in the amount of $10,000.

## III.    Conspiratorial Statements[9]

The co-conspirators, in addition to the defendants as charged in the superseding indictment, include Individuals A, B, C, and D. Individual A passed away after the relevant events in this case. Individual D, to the extent she was involved in securing, retrieving, and concealing the tapes depicting Kelly engaged in sexual activity, was a co-conspirator of the other individuals involved in those activities. But Individual D, with whom Kelly engaged in sexual activity right around the time Individual D turned 18 years old, was also a victim of Kelly's conduct.

The statements between the coconspirators in furtherance of the conspiracies involving obstruction of justice and receipt of child pornography fall into numerous categories concerning subjects integral to the conspiracies, actions in furtherance of the conspiracies, and to the success of the conspiracies. The statements are too voluminous to be listed in their entirety in this proffer. As a result, the nature of the statements are described by category below. This list provides an illustration of, but not an exhaustive description of, the nature of these statements.

---

[9] As set forth above, a number of out-of-court statements from these sources will be admissible without regard to the coconspirator hearsay rule, because they are statements of the defendants, statements not offered to prove the truth of the matter asserted, or for other reasons.

The statements of coconspirators made in furtherance of the charged conspiracies include the following categories of statements:[10]

1.    Statements made by Individual A, Individual B, Individual C, and Individual D to each other, to others, or in documents, in the course of collecting and returning to defendants videotapes depicting Kelly engaged in sexual acts with minors. These statements include, for example, those related to booking travel and making arrangements to meet with defendants for the purpose of returning the videotapes.

2.    Statements made by Individual A, Individual B, Individual C, and Individual D to each other, to others, or in documents, regarding payments received or owed to collect and return to defendants videotapes depicting Kelly engaged in sexual acts with minors or to ensure that they would not cooperate with law enforcement or otherwise disclose information regarding such activity.

3.    Statements made by Individual A, Individual B, Individual C, and Individual D to each other, others, or in documents, regarding polygraph examinations administered concerning Individual C, B, Individual C, and Individual D's knowledge of or efforts to collect and return to defendants videotapes depicting Kelly engaged in sexual acts with minors.

The statements proffered in the preceding section of this submission of Individuals A, B, C, and D constitute coconspirator statements under Rule 801(d)(2)(E) because they are statements of coconspirators in furtherance of the conspiracy. These statements, combined with the anticipated testimony of Minors 1, 4, and 5, and the other evidence set forth above demonstrate the existence of conspiracy, the defendants' knowing participation in it, and the acts they committed in furtherance of it. The statements of the defendants, to the extent they are not

---

[10] The government is not detailing each and every proposed coconspirator statement of each witness or document, but rather a representative sample of the statements from each witness and/or document. Further, by attributing statements to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed. Of course, the government is committed to establishing the *Bourjaily* predicates at trial and the ultimate admissibility of coconspirator statements is governed by the trial evidence.

otherwise admissions, constitute coconspirator statements under Rule 801(d)(2)(E). The statements of Individuals A, B, C, and D fall squarely within Rule 801(d)(2)(E) as well and the government requests that they be admitted on that basis.

## CONCLUSION

The above is an outline of the evidence that the government will introduce to .establish that the charged conspiracies existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as coconspirator statements like them, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ Jeannice Appenteng*
JEANNICE APPENTENG
ELIZABETH POZOLO
JASON JULIEN
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300