UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 567 |
| vs. | ) | |
| | ) | Hon. Harry D. Leinenweber |
| | ) | |
| DERREL MCDAVID | ) | |

## **SUPPLEMENTAL MOTION TO COMPEL DISCOVERY**

COMES NOW Defendant Derrel McDavid, by and through his attorneys Beau B. Brindley and Vadim A. Glozman, and hereby moves this Honorable Court to compel discovery as outlined below:

Recent discovery disclosures have exposed what appears to be an emerging pattern of improper communications between government counsel and witnesses in this case. These mysterious, clandestine, and totally inappropriate forms of communication necessitate further investigation into (1) the circumstances surrounding the handling of the witnesses in this case by government counsel and government agents; and (2) the question of whether witnesses may have been improperly influenced by these individuals.

On August 1, 2022, the government first disclosed copies of email correspondence between Assistant United States Attorney Angel Krull, the former lead prosecutor on this case, and potential witness Jim DeRogatis[1] that took place in April of 2019, prior to the indictment in this case. In this otherwise unreported

---

[1] Jim DeRogatis has been personally served with a subpoena to testify at the upcoming trial and has acknowledged receipt of that subpoena.

correspondence, Ms. Krull inexplicably used a burner email account with the pseudonym "Demetrius Slovenski" and the username piedpiper312.[2] As a result of this disclosure, Mr. McDavid moved this Court to compel disclosure of other information related to this exchange and any similar occurrences between the U.S. Attorney's Office and any potential witnesses (Dkt. 247). That motion is currently pending and awaiting a response from the government.

The disclosure of this surreptitious communication between the lead AUSA assigned to this case and a potential witness also casts new light on other communications that have been recently disclosed to the defense. Specifically, there are additional communications involving AUSA Krull, which, after additional scrutiny, appear to be equally, if not more, troubling than the revelation of the "Demetrius Slovenski" subterfuge addressed in the motion to compel disclosure.

In particular, the discovery contains screen captures of text messages that were exchanged between AUSA Krull and Minor 1 during the investigation of this case. While they were categorized as discussions of scheduling, the general tenor of these messages is extremely familiar and oddly personal in a way that is simply not consistent with the professional standards of the U.S. Attorney's Office. When combined with AUSA Krull's apparent cloak-and-dagger scheme with Jim DeRogatis, a closer analysis of these text messages' contents reveals a number of troubling questions that call for swift answers.

---

[2] Government counsel attempted to explain AUSA Krull's behavior at the pretrial conference in this case on August 3, 2022. However, subsequent comments from Jim DeRogatis to the Sun Times and Chicago Tribune contradict that explanation. Issues related to DeRogatis's comments will be addressed in a reply to the government's response to the initial motion to compel.

These Krull/Minor 1 text messages are notable (and troubling) for multiple reasons: (1) the meetings and calls arranged by AUSA Krull and Minor 1 referenced in these messages do not correspond to any disclosed reports of meetings or interviews with Minor 1, (2) AUSA Krull makes reference to needing to contact Minor 1 outside of work hours, (3) instead of using the name of Minor 1 in her contact list in her phone, AUSA Krull has, without explanation, chosen to identify the most critical witness in this case as "Boss Baby," (4) this less-than-professional nickname is referenced in one of the text messages from AUSA Krull, in which she directly addresses Minor 1 as "BB," (5) the unseemly and excessive familiarity and personal nature of the relationship fostered by AUSA Krull is specifically exemplified by her receipt of personal photographs of Minor 1 in the form of selfies showing her pregnancy, which AUSA Krull responded to by effusively complimenting Minor 1 as being "beautiful" and "glowing," and saying that she was "very happy and excited" for her, and (6) the indication that these pregnancy selfies were shared between AUSA Krull and HSI Agent Amalia Molina, who apparently also participated in several of the unreported meetings and phone conversations referenced in these text messages. Undue influence of witnesses by government attorneys cannot be tolerated. Excessive familiarity and personal connections between government attorneys and critical witnesses are improper precisely because such personal connections allows for improper influences on the witnesses that can shape, taint, or skew the testimony they ultimately give.

According to the text messages between Minor 1 and AUSA Krull, Agent Molina was also in personal contact with Minor 1—it was Agent Molina who provided the pregnancy selfie of Minor 1, which was not at all germane to any aspect of the investigation in this case, to AUSA Krull. According to the text messages disclosed, Agent Molina directly sent multiple pregnancy selfies of Minor 1, and apparently chose her favorite to forward on to AUSA Krull who then made a series of effusive comments about it to Minor 1. This kind of blatant pandering with a material witness in the case is not only inexplicable and unorthodox, but it creates the plain appearance of impropriety.

Aside from the obvious indecorum of referring to Minor 1—the central witness of both the 2002 case and the instant matter—as "Boss Baby" and "BB," as well as receiving and commenting on extremely personal photographs of Minor 1, all of which suggests an inappropriate personal relationship that developed either during the time the government was attempting to induce Minor 1 into cooperating, or worse, pre-dating the investigation altogether, the most egregious revelation stemming from these text messages is that there were multiple phone calls and at least one in-person meeting between Minor 1, AUSA Krull, and possibly Agent Molina that were not memorialized[3].  They are as follows:

| Date | Type of Communication |
| --- | --- |
| August 21, 2019 | Phone call |
| November 19, 2019 | Phone call |
| January 22, 2020 | In-person meeting |
| February 24, 2020 | Phone call |
| March 5, 2020 | Phone call |

[3] In addition, unlike text messages that the agents exchanged with other witnesses that were properly memorialized in reports, these text message conversations were not.

| June 2, 2020 | Phone Call |
| June 10, 2020 | Phone Call |

The absence of any memoranda or reports regarding these seven conversations (that the defense knows of) raises serious *Brady v. Maryland* concerns regardless of whether they were never properly memorialized or simply not turned over. Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure requires the government to provide defendants with documents or other tangible objects that are "material to the preparation of the defendant's defense." To be material, the discovery sought must "significantly help in uncovering admissible evidence, aiding witness preparation, corroborating testimony, *or assisting impeachment and rebuttal.*" *United States v. Gaddis*, 877 F.2d 605, 611 (7th Cir. 1989) (emphasis provided); *see also United States v. Chappell,* 990 F.3d 673, 678 (8th Cir. 2021) (due process requires the government to disclose evidence "material to guilt, punishment, and credibility of a witness."). The Brady doctrine "applies equally to evidence impeaching the credibility of Government witnesses" as it does to exculpatory evidence. *United States v. Kime*, 99 F.3d 870, 882 (8th Cir. 1996); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Reports of conversations that would illustrate an inappropriate personal relationship with a witness certainly qualify for disclosure under this doctrine.

Minor 1's testimony is critical to the government's case. Her credibility is certain to be at issue at trial. The government's entire theory of obstruction of justice stems from, in part, the claim that Minor 1 lied to a grand jury in 2002. To

now have at least seven undocumented conversations and meetings with this initially reluctant witness is evidence that, at best, there are other facts and assertions Minor 1 has relayed to the government that have been kept from the defense or, at worst, there was some sort of undue influence or coaxing of this witness who never sought out this attention from the government, which was not documented in any way. Neither is acceptable.

When taken against the backdrop of typical governmental procedures when communicating with witnesses in an investigation, the absence of any documentation of these meetings highlights the impropriety of what the text messages reveal. Even in this case, as an example, the government created reports detailing calls and text messages received by witnesses. *See* 6/2/2022 HSI Report of Investigation ("ROI") (documenting a text message agents received from Minor 7); 9/2/2021 HSI ROI (documenting phone call agents received from Minor 3); 8/16/2021 HSI ROI (documenting communication and social media documentations agents received from Minor 7); 6/3/2021 HSI ROI (documenting multiple days Minor 4 contacted agents); 1/20/2021 HSI ROI (documenting Minor 4's month-long communication with agents); 10/18/2021 HSI ROI (documenting agents receiving a call from Minor 3); 12/15/2021 (documenting a voicemail received by the USAO from a potential alleged victim); 10/5/2020 HSI ROI (documenting Individual D contacting agents about social media documentation); 6/2/2022 HSI ROI (documenting agents receiving a voicemail from a witness); 6/6/2022 HSI ROI (documenting agents receiving a voicemail from a witness). The government also

created reports when agents contacted the witnesses and even mere *attempts* to contact them. *See* 7/17/2020 HSI ROI (documenting Agent Molina's attempts to contact a potential alleged victim by phone); 7/13/2020 HSI ROI (documenting Agent Molina's phone contact with Minor 4); 3/12/2020 (documenting agents phone contact with witnesses and serving subpoenas); 8/15/2020 HSI ROI (documenting agents contacting Minor 7 regarding social media chat messages); 8/24/2020 HSI ROI (documenting agents calling a potential witness); 12/2/2019 HSI ROI (documents agents attempting to contact a potential witness and receiving a phone call from the potential witness). Yet, none of that documentation occurred with these conversations between AUSA Krull and Minor 1.

This means that AUSA Krull participated in a clandestine, pseudonymous dialogue with Jim DeRogatis, the journalist whose reporting began the investigation into Robert Kelly in 2002; and she engaged in unreported and apparently secret conversations with the critical witness whose presence on a video and under oath statements about that video created the entire case in 2002 and the obstruction justice claim here. She has, without any documented explanation, an oddly personal nickname for this critical witness saved in her I-phone and strangely personal text message exchanges. This combination of facts illustrates improper and clandestine handling of witnesses by a government attorney who spoke to and influenced every critical witness in this case.

Interestingly, both AUSA Krull and Agent Molina are no longer a part of this case. As previously indicated, AUSA Krull was originally the lead prosecutor on this

case. She left the case (although did not withdraw as counsel) sometime in 2020 and was transferred to a U.S. Attorney's Office in another district. HSI Agent Amalia Molina was also a prominent participant in the early stages of the government's investigation. She testified before the grand jury that returned an indictment in this case. She is conspicuously absent from the government's witness list for trial.

In sum, these text messages suugest that AUSA Krull and Agent Molina fostered an inappropriate personal relationship with Minor 1, who is indisputably one of the central witnesses in this case. Whether this was done with the intention of fostering undue influence over Minor 1 and her potential testimony is not clear from the face of the text messages. But, especially in light of the fact that many of the referenced meetings and telephone conversations were apparently undocumented, the appearance of impropriety is certainly present.

Due to the troubling nature of these communications, and the previously revealed emails between AUSA Krull (as Demetrius Slovenski) and Jim DeRogatis, Mr. McDavid asks this Court to compel additional discovery regarding the government's communications with witnesses in this case. Mr. McDavid requests an order requiring the government to disclose:

1. Any and all text messages exchanged between Minor 1 and AUSA Angel Krull, whether before or after she left the United States Attorney's Office for the Northern District of Illinois.

8

2. An explanation for the "Boss Baby" entry in the AUSA Krull's I-phone and when it was input; as well as an explanation for when and why Agent Krull started referring to a critical witness with such a peculiar and personal nickname or a shortened form of it ("BB").

3. Any and all contacts between AUSA Krull and any other civilian potential witness in this case regardless of whether or not the government intends to call them as a witness in their case-in-chief, including any and all text messages, emails, records of phone calls (cell phone and landline), and any other communications she may have had with witnesses under her name, their name, or any other aliases.

4. Any and all contacts between Agent Amalia Molina and Minor 1 or any other civilian potential witness in this case. It is apparent there are texts between Molina and Minor 1. They are referenced in the "Boss Baby" texts. At the very least, those must be turned over at once.

5. All communications exchanged between AUSA Krull and Agent Molina during this investigation (with appropriate limitations for sensitive matters and other investigations if applicable).

The above items are necessary to ensure that Mr. McDavid has adequate discovery in this case concerning potential improper influence on witnesses against him, and to ensure that he has adequate information to intelligently determine whether any additional motions may be necessary as a result of this clandestine and unprofessional communication and disclosure.

WHEREFORE, Defendant Derrel McDavid respectfully moves this Court to order disclosure of the items detailed above.

Respectfully submitted,

/s/ Beau B. Brindley
*An Attorney for Derrel McDavid*

/s/ Vadim A. Glozman
*An Attorney for Derrel McDavid*

Beau B. Brindley
LAW OFFICES OF BEAU B. BRINDLEY
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
(312) 765-8878

Vadim A. Glozman
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1128
Chicago, IL 60604
(312) 726-9015