UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 567 |
| vs. | ) | |
| | ) | Hon. Harry D. Leinenweber |
| | ) | |
| DERREL MCDAVID | ) | |

**MOTION FOR ATTORNEY'S FEES AND LITIGATION EXPENSES
PURSUANT TO THE HYDE AMENDMENT, 18 U.S.C. § 3006A, NOTE, AND
THE EQUAL ACCESS TO JUSTICE ACT, 28 U.S.C. § 2412**

COMES NOW the Defendant, Derrel McDavid, by and through his attorney, Beau B. Brindley, and moves this Court for the payment of Attorney's Fees and Litigation Expenses Pursuant to the Hyde Amendment, 18 U.S.C. § 3006A, Note, and the Equal Access to Justice Act, 28 U.S.C. § 2412. In support, he states the following:

**INTRODUCTION**

"The government has stretched this case well-beyond reasonable limits while attempting to bring an indictment against Mr. McDavid." Doc. No. 274. This fact was recognized by the jurors who, after sitting through weeks of irreconcilably inconsistent testimony from admitted liars, thieves, and extortionists, performed its civic duty and acquitted Mr. McDavid of all charges.[1] Doc. No. 336. Though it may be easy to succumb to sensationalized allegations, guilt by association, and the prevailing fervor of the moment, the jurors in this case did not accept *easy* as an answer. Instead, they did their duty and ensured that the constitutional guarantee that Mr. McDavid be presumed innocent util proven guilty amounted to more than

---

[1] The jury even acquitted Robert Kelly of more than half of the charges levied against him, in large part, based on the lies and falsehoods exposed by Mr. McDavid's vigorous defense.

mere words recited during jury instructions. One might expect government agents and prosecutors investigating and bringing these charges—government actors who have a duty uphold this and all other constitutional protections—would, too, be able to say "no" to the easy answer and cease to bring charges against someone when the evidence about them is irreconcilably conflicted and incoherent. In this case, those actors failed to live up to this expectation.

Thankfully, Congress has not left those who prevail in defending against the unfounded allegations of capricious and overzealous prosecutions without a remedy. In 1997, keenly aware of the harms such prosecutions inflict on their defendants, Congress passed the Hyde Amendment, allowing a prevailing criminal defendant to recover reasonable attorney's fees and other litigation costs where the position of the government was vexatious, frivolous, or in bad faith. The case against Mr. McDavid was just that.

From the commencement of the investigation through the pendency of the trial, the prosecution of Mr. McDavid was vexatious, frivolous, and in bad faith. The government's reliance on the testimony of witnesses who irreconcilably contradict each other on key aspects of their respective accounts of events—as well as contradicting themselves repeatedly in various statements made under oath—illustrates what can, most charitably to the government, be described a callous indifference towards the truth. Moreover, the government made no legitimate effort to correct, and, at times, embraced clear and undeniable falsities espoused by their witnesses. Making matters even worse, where the government's witnesses did not tell the story it sought, the government cut its own narratives from whole cloth and with no factual basis. Though the jury saw through the lies and false narratives endorsed by the government, that is not the end of the story authored by Congress: the government must be held to account for its

vexatious, frivolous, and bad faith prosecution of Mr. McDavid. The Hyde Amendment entitles Mr. McDavid to recover attorney's fees and litigation costs he incurred in defending his liberty against these unfounded charges.

## BACKGROUND

On June 13, 2008, Robert Sylvester Kelly was acquitted of charges following his trial in Cook County, Illinois. More than ten years later, on July 10, 2019, a grand jury returned the indictment charging Mr. McDavid with allegations of illegal conduct stemming from his representation of Kelly in the decade leading up to Kelly's 2008 acquittal. Of the thirteen counts in the indictment, four listed McDavid as a defendant. Count Five alleged conspiracy to violate 18 U.S.C. § 1519: Destruction, alteration, or falsification of records in Federal investigations and bankruptcy. Count Six alleged conspiracy to receive child pornography, namely, the two alleged tapes that formed the substantive charges of receiving child pornography in Counts Seven and Eight. Each of these charges against Mr. McDavid was factually and legally unsound.

Beginning with Count Five, the government argued that Mr. McDavid conspired with Kelly to violate § 1519. Given that the statute has a five-year statute of limitations, the government endeavored to torture the facts to allege that some conduct occurred after 2014, which could extend the statute of limitations and make the offense chargeable in 2019. Both the substantive allegations of the charge itself, as well as the government's attempts to bring the charge within the statute of limitations, suffered from critical factual and legal deficiencies.

For instance, the government alleged that Mr. McDavid made payments to Jane and Jane's family to buy silence in furtherance of the conspiracy:

> From at least approximately 2000 to approximately 2015, KELLY and MCDAVID made payments to and bought gifts for Minor 1 and Minor l's parents with the intent to persuade and induce Minor 1 and Minor l's parents to conceal, cover up,

falsify, and make a false entry in any record, document, and tangible object about KELLY's sexual relationship with Minor 1, and to continue to abide by previous false statements and entries in such items, including the existence of multiple videos depicting KELLY engaging in sexual contact and sexual acts with Minor 1.

Doc. No. 93 at 12. However, both Jane and Jane's mother, Susan, denied that any payments were made for the purpose of concealing anything, and particularly that Mr. McDavid had never suggested that either of them lie. Susan's testimony on the matter makes clear that there is no truth to the government's allegations:

> Q. So there wasn't any money that your family was getting that anybody ever told you was connected to lying, was there?
> A. No.
> Q. None of the money your family ever got was ever suggested to you that it was connected to being silent about anything. Nobody ever suggested that, right?
> A. No.
> Q. You never believed that, did you?
> A. No.
> Q. In the few conversations you have ever been involved with with Derrel McDavid, he has always been respectful, correct?
> A. Correct.
> Q. You have never had any issues with Mr. McDavid, have you?
> A. No.
> Q. Mr. McDavid has never threatened you, has he?
> A. No.
> Q. And Mr. McDavid has never suggested that you lie about anything, has he?
> A. No.

08/22/2022 Tr. at 1288-89. Moreover, Jane flatly denied that her relationship with Kelly after the 2008 acquittal had anything to do with any effort to conceal or cover up anything. 08/19/2022 Tr. at 873-74. There was no testimony at all indicating that any payment made to anyone after 2014 was at all connected to buying silence. Yet, that is what the government told the jury—even though its own witnesses said there was no such purpose for these payments.

With regard to Counts Six through Eight, the prosecution appeared to completely

abandon its responsibility to make sure that the charges it brought were factually sound. As a primary matter, the witnesses critically contradicted each other on fundamental aspects of their testimony. Therefore, neither the jury nor the government could reasonably believe that all of the witnesses were simultaneously telling the truth. The following are merely a few illustrations of this failing:

- Chuck Freeman claimed to have had conversations with Lisa Van Allen regarding the location of the tape he claimed to have recovered. He claimed that Van Allen told him that the tape she stole was located somewhere in Georgia. Lisa Van Allen denied having any such conversations with Freeman. Lisa Van Allen denied that the tape she stole was ever sent to Georgia by anyone at any time.
- Lisa Van Allen claimed that the tape she sent to Keith Murrell contained Video 2, Video 3, and Video 4. Murrell claimed that the tape only had one scene that appeared to be a normal threesome with Mr. Kelly and two women.
- Lisa Van Allen claimed that she watched the tape containing Video 2, Video 3, and Video 4 with Mr. McDavid after Murrell provided it to him. Murrell claims the tape he gave to Mr. McDavid did not contain Video 2 or Video 3.
- Chuck Freeman testified that the tape Murrell possessed depicted a threesome scene on a bed. Van Allen claimed that the tape she sent Murrell occurred in Kelly's "log cabin room."

- Van Allen testified that she watched the tape with Mr. McDavid in March of 2007 after Murrell brought the tape. Murrell denied being at any meeting with McDavid in March 2007.

These points are just a few examples of a problem that pervasively plagued the government's case against Mr. McDavid. The government had one story to tell the jury. They explicitly asserted that (1) Lisa Van Allen took a tape from Robert Kelly; (2) that tape contained Videos 2, 3, and 4; (3) Chuck Freeman recovered that stolen tape from Georgia; and (4) a copy of this tape was provided to Derrel McDavid by Keith Murrell. That was their story, based on the testimony of their witnesses , they absolutely had to know that it could not possibly be true.

They knew that Chuck Freeman said the tape he recovered did not contain any threesome scene. They knew that he said that he never possessed Video 4. They knew that Lisa Van Allen claimed that Videos 2, 3, and 4 were on the one and only tape she took from Kelly. That obviously means that Chuck did not recover the video Lisa took. Furthermore, they knew that Van Allen said she gave the only video she ever took from Kelly to Murrell and that it never went to Georgia. So they knew that Freeman could not have recovered any tape taken by Van Allen from there.

They also knew that Murrell said he never possessed any video containing Videos 2 or 3. So, the video Chuck gave to the government could not have been a copy of the one that Lisa took from Kelly and gave to Murrell. That means that, from the very start, the government knew that the theory that there was a tape stolen by Lisa, recovered by Chuck, and a copy of that tape given to McDavid by Murrell was false. The testimony of their own witnesses would not allow that story to be coherently told. They knew it. Yet, they told it anyway. They presented these irreconcilably inconsistent and incoherent witnesses to a jury and tried to pretend that they told a

story that they simply did not and could not.  The government's theory about Videos 2, 3, and 4 could not possibly be true based on the testimony of their principal witnesses.  But they presented it to the jury anyway.  They told a story that their evidence said could not possibly true.  That is surely reckless indifference toward the truth.

The government's witnesses against Mr. McDavid not only contradicted each other; they critically contradicted their own prior statements. Lisa Van Allen's testimony in this case was particularly striking, given that is critically contradicted by her own prior statements made under oath. Particularly, Van Allen asserted in this trial that she stole a tape containing three scenes, two of which depicted just Robert Kelly and Jane. "I have never seen a tape with just Robert and Jane. Only me, Robert and Jane." Exhibit A. This apparently was not something the government saw fit to inquire into, as it this statement did not fit its theory of the case. But it remained under oath testimony about which they were very much aware.

This disregard for the truth was not merely an issue at trial, but also infected the grand jury proceedings. After the government learned that Van Allen had not been accurate or truthful about how old she was when she met Kelly, the prosecutor deliberately misled the Grand Jury as to Van Allen's untruth:

> If you recall, her testimony was that she met him on a video shoot for the video Home Alone which happened in Georgia where she lived and obviously that was a long time ago. She had estimated that it happened in 1997 or 1998.
>
> She couldn't be sure exactly when.

Exhibit B at 15-16. The government's characterization of Lisa Van Allen's Grand Jury testimony is particularly striking when read alongside what she actually said to the grand jury:

> I met Robert Kelly in late 1997 or early 1998 in Alpharetta, Georgia when I was 17-years-old.
> . . .
> Robert asked me how old I was, and I told him I was 17-years-old.

> . . .
>
> About a month later, when I was still 17, I called Robert using the phone number that he gave me.
>
> . . .
>
> Not long after that Robert flew me back to Chicago at least one more time when I was still 17.

Exhibit C. Though Van Allen was uncertain of the precise year, she was unequivocally certain that she was seventeen years old. The government, thus, mischaracterized Van Allen's testimony to the grand jury in a way that was completely at odds with her statement. They led jury to believe she expressed some uncertainty as to her age. She did not.

With regard to Chuck Freeman, the government heard their witness testify in a manner completely different than his prior statements. This is not a matter of minor inconsistencies; the witness told an entirely different story each time he spoke to the government. The government was reminded of its obligations to correct perjurious testimony under *Napue v. Illinois*, yet it made no such attempts on its own. The government posited that it could not determine which aspects of Freeman's testimony were true or false. The government's opening statement, however, relied on a completely different version of facts than that which came out during the witness's testimony. For instance, the government told the jury that they would hear the following testimony from Freeman:

> Freeman eventually met with Brown and Kelly at Kelly's home. And Brown placed a copy of Video 4 into a VCR for Freeman to watch. Kelly asked Freeman where the copy of the tape was that contained Video 4 because what Freeman had brought to them only contained Video 2 and Video 3.

08/17/2022 Tr. At 485. The government's prediction of Freeman's testimony was entirely different than Freeman's actual testimony that Mr. McDavid, in fact, played the alleged tape for Freeman and that Kelly was not even present in the room. Freeman's testimony is replete with such inconsistencies. The Court noted them itself during the course of the trial. The government

had to notice them. Yet, it proceeded to present his testimony anyway and argue that it was true.

The government's opening statement also mischaracterized the statements their witnesses had made prior to trial. For instance, the government stated that "Freeman continued to investigate and learn that Keith had a tape containing Video 2, Video 3, and Video 4." It is unclear from where the government found support for this statement. Murrell has, at all times, maintained that his tape contained only one scene. Freeman has maintained that any tape Murrell had was different than what he claimed to possess. Such a mischaracterization of the statements of the government's witnesses, at best, is a reckless disregard for the truth.

The continual disregard for the truth in prosecuting Mr. McDavid is not the standard that prosecutors must be held to:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985). In this case, the government apparently ignored that obligation. It brought unfounded charges against Mr. McDavid based on merely its own *ipse dixit* and no effort to determine which, if any, of the witnesses' many conflicting stories were the truth. They presented a theory to the jury that their witnesses' testimony proved incoherent.

## **LEGAL STANDARD**

The Hyde Amendment "authorizes the court in a criminal case to award a reasonable attorney's fee to 'a prevailing party, other than the United States, if the court finds that the government's position was 'vexatious, frivolous, or in bad faith.'" *United States v. Sriram*, 482 F.3d 956, 958-59 (7th Cir. 2007) (quoting 18 U.S.C. § 3006A), *vacated on other grounds*, 552

U.S. 1163, 128 S. Ct. 1134, 169 L. Ed. 2d 946 (2008). Enacted by Congress in the Act of Nov. 26, 1997, Pub.L. No. 105-119, tit. VI, § 617, 111 Stat. 2440, 2519 (1997), *reprinted in* 18 U.S.C. § 3006A, Note (2006), the Hyde Amendment provides, in pertinent part, that:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case . . . pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, *where the court finds that the position of the United States was vexatious, frivolous, or in bad faith*, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code [.] . . . Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails…

18 U.S.C. § 3006A, Note (emphasis added).[2] For entitlement to an award of attorney's fees and litigation expenses under the Hyde Amendment:

> A criminal defendant must show… that: (1) his trial had been in progress during fiscal year 1998 or a subsequent year; (2) his net worth was less than two million dollars; (3) he had been a "prevailing party" in his criminal case, even though subject to possible retrial upon remand; (4) that his legal representation was not the result of court- appointment; and (5) his attorney's fees and costs are "reasonable."

*United States v. Adkinson*, 247 F.3d 1289, 1291 n. 2 (11th Cir. 2001) (*per curiam*) (quoting Hyde Amendment, 18 U.S.C. § 3006A, Note; 28 U.S.C. § 2412).

To prevail under the Hyde Amendment, a criminal defendant must also show "that the

---

[2] The Hyde Amendment expressly incorporates the procedures and limitations of Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. *Id.* The EAJA provides, in pertinent part, that:
> (B) A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed.

28 U.S.C. § 2412(d)(1)(B).

position of the United States was vexatious, frivolous, or in bad faith." 18 U.S.C. § 3006A, Note. "The defendant in the underlying criminal case bears the burden of demonstrating these requirements by a preponderance of the evidence." *United States v. Terzakis*, 854 F.3d 951, 954 (7th Cir. 2017). The defendant need only establish one of these elements to be entitled to recover under the Hyde Amendment. *See United States v. Monson*, F.3d 435, 439 (8th Cir. 2011).

To satisfy this burden, a defendant need not show that each position of the government was vexatious, frivolous, or in bad faith. "Even if the district court determines that part of the government's case has merit, the movant might still be entitled to a Hyde Amendment award if the court finds that the government's 'position' as a whole was vexatious, frivolous, or in bad faith." *United States v. Heavrin*, 330 F.3d 723, 730 (6th Cir. 2003); *accord Commissioner v. Jean*, 496 U.S. 154, 161-62 (1990) ("While the parties' postures on individual matters may be more or less justified, the EAJA -- like other fee-shifting statutes -- favors treating a case as an inclusive whole, rather than as atomized line-items."); *see, e.g., Haile v. Holder*, 384 F. App'x 501, 503 (7th Cir. 2010) (explaining that where the government's position on the "most prominent issue" was substantially unjustified, the court's "stated or silent agreement with the government on other questions does not carry much weight in the substantial-justification calculus" under the EAJA.).

The Hyde Amendment does not define the terms "vexatious," "frivolous," and "bad faith." *See* Hyde Amendment, 18 U.S.C. § 3006A, Note. Those words, therefore, "must be given their ordinary meaning." *United States v. Terzakis*, No. 13 CR 339, 2016 U.S. Dist. LEXIS 110553, at *14 (N.D. Ill. Aug. 19, 2016) (quoting *Chapman v. United States*, 500 U.S. 453, 462, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991)). Circuits vary in how they define the terms. For instance, in the Eighth Circuit, a position is 'frivolous" for purposes of the Hyde Act when it is

"utterly without foundation in law or fact." *United States v. Bowman*, 380 F.3d 387, 390 (8th Cir. 2004); *United States v. Porchay*, 533 F.3d 704, 711 (8th Cir. 2008); *United States v. Beeks*, 266 F.3d 880, 884 (8th Cir. 2001); *accord Gilbert*, 198 F.3d at 1299 ("frivolous action" is one that is "[g]roundless ... with little prospect of success") (*citing* Black's Law Dictionary). Other Circuits have ascribed similar meanings to the term. *See, e.g., United States v. Heavrin*, 330 F.3d 723, 729 (6th Cir. 2003) (A frivolous position is one lacking a reasonable legal basis or where the government lacks a reasonable expectation of attaining sufficient material evidence by the time of trial.)

"The government acts vexatiously within the meaning of the Hyde Amendment when it acts without 'reasonable or probable cause or excuse.'" *United States v. Porchay*, 533 F.3d 704, 711 (8th Cir. 2008) (quoting *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999)). Some courts also add an "intent to harass" element to distinguish vexatiousness from frivolousness. *See, e.g.*, *United States v. Knott*, 256 F.3d 20, 30 (1st Cir. 2001) (holding that "some finding of malice or improper motivation is required" to establish vexatiousness under the Hyde Amendment).

Though the Seventh Circuit "has not defined the operative terms" of the Hyde Amendment, it has recognized that "the terms vexatious, frivolous, and bad faith are all closely related and require some combination of objective deficiency and subjective bad intent." *United States v. Terzakis*, 854 F.3d 951, 955, 956 n.3 (7th Cir. 2017). Thus, "the terms "vexatious" and "frivolous" both require a prevailing party to demonstrate that the government's position was objectively deficient—in other words, that the government lacked a sufficient factual or legal basis on which to initiate or proceed with the case." *United States v. Terzakis*, 854 F.3d 951, 955-56 (7th Cir. 2017).

Like vexatious and frivolous, bad faith is not defined in the Hyde Amendment. However, while the Seventh Circuit has not explicitly defined what level of prosecutorial conduct rises to the level of bad faith for purposes of the Hyde Amendment, the common law understanding of the term used elsewhere in the EAJA is instructive on the term's ordinary meaning.[3] This court recently offered a thorough analysis of the term in *City of Chi. v. Garland*:

> There is no bright-line rule for what constitutes bad faith. "Courts have used phrases such as harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a frivolous claim." *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (citing *Stive v. U.S.*, 366 F.3d 520, 521-22 (7th Cir. 2004) (collecting cases)). The Seventh Circuit has also looked to 28 U.S.C. § 1927, which similarly awards fees for unreasonable and vexatious conduct. *Id.* In the context of a Section 1927 award*, the Seventh Circuit has held that litigants are not required to prove subjective bad faith or malice. Dal Pozzo v. Basic Mach. Co., Inc.*, 463 F.3d 609, 614 (7th Cir. 2006). *Fee awards may also be appropriate under an objective bad faith standard, which only requires proof of reckless indifference to the law. Id.* For example, "[i]f a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Id.* (internal quotation marks and citations omitted).

No. 18 C 6859, 2021 U.S. Dist. LEXIS 81379, at *6-7 (N.D. Ill. Apr. 28, 2021) (emphasis added). "Courts engage in an objective inquiry when determining whether a prosecution was pursued in 'bad faith.'" *United States v. Manzo*, 712 F.3d 805, 811 (3d Cir. 2013).

## ARGUMENT

I. <u>MCDAVID IS ENTITLED TO ATTORNEY'S FEES AND LITIGATION COSTS UNDER THE HYDE AMENDMENT AND THE EQUAL ACCESS TO JUSTICE ACT</u>

A consideration of the government's position as a whole with respect to Mr. McDavid demonstrates that he is entitled to an award of reasonable attorney's fees. The government told the jury a story that had to be false based on the collective testimony of its witnesses. The entire

---

[3] The Hyde Amendment was adopted with an eye toward the EAJA. *See United States v. Gilbert*, 198 F.3d 1293, 1299-300 (11th Cir. 1999) (discussing the legislative history of the Hyde Amendment).

theory about the Van Allen tape containing videos 2, 3, and 4, which they claimed was sent to Georgia and recovered by Freeman, could not possibly be true. If their witnesses were all taken to be telling the truth about what they said on the witness stand, then the government's theory was totally incoherent and their witnesses' accounts irreconcilable. These witnesses provided the essence of the case against Mr. McDavid. And the government knew their combined testimony was necessarily incoherent. This is, by definition, a reckless disregard for the truth, which constitutes a frivolous and vexatious position by the government. This entitles Mr. McDavid to reasonable attorney's fees.

      a.  <u>Mr. McDavid is the Prevailing Party</u>

Though the Hyde Amendment does not define the term "prevailing party" or instruct courts on the term's application in the criminal context[4], "[t]he principle is clear enough as applied to some dispositions: . . . an acquittal following a trial would clearly make a defendant a prevailing party." *United States v. Terzakis*, 854 F.3d 951, 954 (7th Cir. 2017). Mr. McDavid was acquitted following trial; he is "clearly . . . a prevailing party." *Id*[5].

      b.  <u>The Prosecution of Mr. McDavid was Frivolous.</u>

The prosecution of Mr. McDavid was frivolous because the position of the government regarding its theory of the case had no coherent basis in law or fact. With regard to Count Five of the indictment, the government produced no evidence upon which a reasonable juror could conclude beyond a reasonable doubt that any overt act furthering the conspiracy was committed within the statute of limitations period. Moreover, Jane and Susan, the government's own

---

[4] The term was adopted from the EAJA's civil fee-shifting structure.
[5] For an individual to qualify as a "party," the EAJA requires that the individual's net worth be less than $2,000,000. Mr. McDavid's net worth was below $2,000,000 when he was indicted and throughout the pendency of his prosecution.

witnesses, expressly refuted that there was any payment or gift given to them to conceal or cover up a tangible document. With Jane's unequivocally denying that she received any payments in exchange for silence, all that was left tying the charge to the statute of limitations were settlement payments Kelly made to Mr. McDavid in 2014 and 2015, after a contentiously litigated lawsuit. However, the government did not introduce a shred of evidence that the settlement involved anything other than a lawsuit for legitimately earned money owed to Mr. McDavid. Not a single witness gave any such testimony. There was certainly nothing that could be indicative of guilt beyond a reasonable doubt when there was no actual evidence saying that any payment made after 2014 was connected to the 2008 case in any way.

With regard to Counts 6-8, the government's story was simply not supportable by the facts. Freeman said he obtained a tape that Van Allen took from Kelly from some residence in Georgia after Van Allen told him where to find it. Van Allen said this never happened. She claimed she took one tape and it never went to Georgia; it went only to Keith Murrell. Freeman said the tape he recovered in Georgia had no threesome scene on it. Van Allen said the only tape she took had three scenes on it—two with Robert and Jane alone and one threesome scene. Murrell said the only tape he received had no scenes of just Kelly and Jane. It was one threesome scene of Robert and two women. Yet, the government's position was that the tape Freeman obtained came from Van Allen. Their position was that the tape Van Allen took had all three scenes on it and was ultimately given to McDavid by Murrell. The testimony of their own witnesses made it plain that this position could not be true. Yet, they took that position in front of the jury. There is no way they did not know it was incoherent based on the witness testimony. There is no way they did not know that this position was irreconcilably inconsistent with the testimony that their witnesses would give. Yet, they presented it to the jury anyway. That is, at

best, reckless disregard for the truth.  And that makes this prosecution frivolous.

        **c.**   <u>The Prosecution of Mr. McDavid was Vexatious.</u>

The investigation and prosecution of Mr. McDavid were vexatious because it was without reasonable or probable cause or excuse. There was no excuse for claiming that payments after 2014 were for the purchase of silence when the people who received the payments said there was no such purpose.  There was no excuse for claiming a legal settlement between McDavid and Kelly was for some illicit purpose when there was no evidence of that whatsoever. There was no excuse for positing a theory to the jury about the videotape giving rise to Counts 6-8 that was incoherent and could not possibly be true based on the testimony of their witnesses. That makes this prosecution vexatious.

        d.   <u>The Prosecution of Mr. McDavid was in Bad Faith.</u>

Bad faith is satisfied when a prosecutor knowingly or recklessly pursues a frivolous claim, *United States v. Shaygan*, 652 F.3d 1297, 1312 (11th Cir. 2011), or acts in reckless disregard for the truth. *See id.* (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). Thus, the foregoing discussion is equally relevant to a finding of bad faith. *See id.* (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). In this case, the government apparently made no effort to determine which, if any, of the witnesses' irreconcilable stories were true. Rather, they operated under the strategy of presenting a position to the jury that their witnesses' collective testimony rendered incoherent.  That is reckless disregard for the truth.

From misleading the Grand Jury as to Lisa Van Allen's testimony, to mischaracterizing the evidence its opening argument, to relying on witnesses who had told so many varying stories that the government could not ascertain if a witness had perjured themselves or not, the prosecution in this case continually illustrated a reckless disregard for the truth.  That means this

prosecution was in bad faith.

II.    <u>MR. MCDAVID'S ATTORNEY'S FEES ARE REASONALBE.</u>

The Hyde Amendment itself provides for the award of "a reasonable attorney's fee." 18 U.S.C. § 3006A, Note. In calculating reasonable attorney's fees, this court has applied "the lodestar method, multiplying the number of hours reasonably expended on the litigation . . . by a reasonable hourly rate." *City of Chi. v. Garland*, No. 18 C 6859, 2021 U.S. Dist. LEXIS 81379, at *16 (N.D. Ill. Apr. 28, 2021) (quoting *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)) (internal quotation marks omitted in original). The Seventh Circuit has "defined a reasonable hourly rate as one that is 'derived from the market rate for the services rendered.'" *Pickett*, 664 F.3d at 640 (quoting *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003)).

In defending his freedom, Mr. McDavid incurred $850,000 in legal fees, $600,000 of which are still outstanding, and which he must now liquidate real property and other assets in an attempt to pay. This amount is reasonable given the immense work that went into defending this high-profile, three-year prosecution. The flat fee, when broken down hourly, is clearly reasonable. The two months before trial, the undersigned counsel worked on this case for an average of 80 hours per week. That increased to an average of 100 hours per week during the trial. Adding to that is over 500 hours of discovery review that the undersigned counsel completed for this case. $750 is a reasonable per hour is a reasonable market rate for the services rendered given the undersigned's expertise, level of success, and experience. On top of that, Law offices of Vadim A. Glozman also worked hand in hand with Law Offices of Beau B. Brindley throughout the preparation for, and execution of, the trial in this case.[6]

---

[6] A more detailed breakdown of time spent can be provided in a supplement to this motion at the request of the Court.

Using the conservative estimate of 1,220 hours worked on this case, $850,000 reduces to an hourly rate of $696.72. The rate in this case is imminently reasonable.

**CONCLUSION**

Mr. McDavid's life was unalterably changed by the frivolous, vexatious, and bad faith prosecution over which he prevailed. The Hyde Amendment and Equal Access to Justice Act entitle him to recover reasonable attorney's fees.

WHEREFORE Mr. McDavid respectfully request that this Honorable Court grant his motion and award him reasonable attorney's fees in the amount of $850,000.